Dale M. Cendali
Shanti Sadtler Conway
Jeremy C. King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460
dale.cendali@kirkland.com
shanti.conway@kirkland.com
jeremy.king@kirkland.com

*Attorneys for Plaintiff The Carnegie Hall Corporation*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE CARNEGIE HALL CORPORATION, | Case No.: 25-cv-4224 |
| Plaintiff, | ECF Case |
| v. | **COMPLAINT** |
| CARNEGIE HOSPITALITY LLC, CARNEGIE DINER 57 LLC D/B/A CARNEGIE DINER & CAFE, CARNEGIE DINER 828 LLC D/B/A CARNEGIE DINER & CAFE, CARNEGIE DINER SECAUCUS, LLC, CARNEGIE DINER VIENNA LLC D/B/A CARNEGIE DINER, and EFSTATHIOS ANTONAKOPOULOS | **JURY TRIAL DEMANDED** |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff The Carnegie Hall Corporation ("Carnegie Hall"), by and through its attorneys,

Kirkland & Ellis LLP, hereby alleges against Defendants Carnegie Hospitality LLC ("Carnegie

Hospitality"); Carnegie Diner 57 LLC d/b/a Carnegie Diner & Cafe ("Carnegie Diner 57"),

Carnegie Diner 828 LLC d/b/a Carnegie Diner & Cafe ("Carnegie Diner 828"), Carnegie Diner

Secaucus, LLC ("Carnegie Diner Secaucus"), Carnegie Diner Vienna LLC d/b/a Carnegie Diner

("Carnegie Diner Vienna") (collectively, the "Individual-Restaurant LLC Defendants"); and Efstathios ("Stathis") Antonakopoulos (all, collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.    Carnegie Hall is an iconic American brand, which, along with its predecessors, affiliates and licensees (collectively with Carnegie Hall, the "Carnegie Hall Entities"), has used its CARNEGIE HALL trademarks (the "CARNEGIE HALL Marks") for 130 years.  Carnegie Hall's CARNEGIE HALL Marks and brand have become synonymous with excellence.  The historic Carnegie Hall concert venue is, and long has been, the home of iconic performances of all genres, from Yo-Yo Ma to the Beatles, Miles Davis to Judy Garland, and Mark Twain to Lenny Bruce. The Carnegie Hall Entities offer a multitude of goods and services that complement their mission of bringing the transformative power of music to the widest possible audience—from food and beverage offerings, to numerous categories of branded merchandise, to video-on-demand services, podcasts, touring orchestras and education programs under the CARNEGIE HALL Marks.  Such goods and services are offered to consumers throughout the United States, as well as internationally.

2.    Taking advantage of the fact that Carnegie Hall is such a beloved brand and cultural institution, Defendants willfully decided to open an expanding chain of restaurants called the "Carnegie Diner and Café" (the "Carnegie Diners"), which are themed around and focused on Carnegie Hall's brand, using CARNEGIE-formative trademarks, trade dress, and marketing materials (collectively, the "Infringing Marks").  The Carnegie Diners trade off of Carnegie Hall's strong brand, reputation and goodwill, and are likely to confuse consumers and dilute Carnegie Hall's valuable trademarks.  In fact, Defendant Mr. Antonakopoulos has admitted in the press that Defendants' Carnegie Diners are designed "to pay homage to Carnegie Hall" and are "all about

the music of Carnegie Hall." But Defendants have not created a mere "homage"; they have stolen and are trading off of Carnegie Hall's valuable trademarks and brand.

3.       Not only is CARNEGIE the most prominent aspect of the name and logo of the Carnegie Diners, but Defendants have taken every opportunity to use imagery and branding associated with Carnegie Hall to capitalize on this connection and give the false impression that Carnegie Hall is affiliated with Defendants and their Carnegie Diners. For example, the restaurants feature wall-size murals of Carnegie Hall's famous building and stage, which Defendants have designed to make consumers feel like they are eating inside Carnegie Hall's landmarked concert hall. Consumers are encouraged to take and post on social media photographs of themselves in front of these murals, making it appear that they are onstage at Carnegie Hall itself. As one example, below is a side-by-side comparison of (1) Carnegie Hall's Stern Auditorium / Perelman Stage (on the left); and (2) an image posted by Defendant Mr. Antonakopoulos on his Instagram account (on the right), which was taken at a Carnegie Diner restaurant and includes Mr. Antonakopoulos (who is second from the left), posing in front of a prominent photograph depicting the identical view of Carnegie Hall's famous stage.

| Carnegie Hall's Stern Auditorium / Perelman Stage | Carnegie Diner |
| :---: | :---: |
|  |  |

4.      These full-wall-size murals of Carnegie Hall's famous stage, however, are far from the only way in which Defendants blatantly and willfully attempt to create an association with Carnegie Hall.  Other walls of the Carnegie Diners feature additional images of Carnegie Hall's famous building and posters of its events.  Additionally, Defendants have actively advertised their restaurants' purported connection to Carnegie Hall, including by referring to Carnegie Hall events in Defendants' online advertisements, and selling merchandise that references Carnegie Hall. Defendants clearly hope that consumers who love and/or are interested in Carnegie Hall will come to their Carnegie Diners, which have expanded beyond New York and are now also located in New Jersey and Virginia.  Defendants also have announced plans to expand even further, by reportedly intending to franchise the restaurants and to open a Carnegie Diner *in every single state* by 2029. The bottom line is that Defendants have opened and marketed a line of misleadingly Carnegie Hall-themed restaurants without any regard to Carnegie Hall's intellectual property rights, its need to protect its brand, and its consumers.

5.      Given this blatant trading on Carnegie Hall's strong trademarks, brand, reputation, and goodwill, Carnegie Hall tried repeatedly to reach an amicable solution in which Defendants cease their infringing and willful conduct.  Yet, Defendants have refused, dragging out settlement talks with no ultimate intent to settle, and even apparently signing a nationwide franchisee agreement to further expand the Carnegie Diners, *after* Carnegie Hall complained.  As a result, Carnegie Hall, a non-profit institution, has had no choice but to use its limited resources on this litigation.  Thus, Carnegie Hall seeks appropriate injunctive and monetary relief to protect its famous trademarks and brand from Defendants' willful infringement, and to protect consumers from being deceived and confused.

## **PARTIES**

6.      Plaintiff The Carnegie Hall Corporation is a New York not-for-profit corporation having its principal place of business located at 881 Seventh Avenue, New York, New York 10019. Carnegie Hall is qualified to do business and is doing business in the State of New York and in this judicial district.  Carnegie Hall owns, uses, and licenses the CARNEGIE HALL Marks.

7.      On information and belief, Defendant Carnegie Hospitality LLC is a limited liability company organized under the laws of New Jersey, with a place of business located at 205 West 57th Street, New York, New York 10019.   On information and belief, Carnegie Hospitality is qualified to do business and is doing business in the State of New York and in this judicial district, as well as in New Jersey and Virginia.  On information and belief, Carnegie Hospitality owns and/or operates the Carnegie Diners at issue in this litigation and oversees and directs the Individual-Restaurant LLC Defendants and, in connection with the same, sells goods and services under the Infringing Marks in this judicial district, as well as in New Jersey and Virginia. Carnegie Hospitality also purports to own the Infringing Marks.

8.      On information and belief, Defendant Efstathios ("Stathis") Antonakopoulos is the owner, operator, and/or principal of Defendant Carnegie Hospitality LLC and the Individual-Restaurant LLC Defendants.   On information and belief, Mr. Antonakopoulos selected the Infringing Marks, caused the Carnegie Diners to be themed around Carnegie Hall and its intellectual property, and has made multiple statements to the press regarding his intention to associate the Carnegie Diners with Carnegie Hall.  On information and belief, Mr. Antonakopoulos actively and knowingly selected and caused the Infringing Marks to be used in commerce in connection with the Carnegie Diners, including in this judicial district, as well as in New Jersey and Virginia.  Below is an image of Mr. Antonakopoulos working at the 57th Street, New York

City Carnegie Diner location from an article announcing Defendants' plans to open a location on 8th Avenue in New York City.[1]

**Mr. Antonakopoulos at the
Carnegie Diner 57th St. location**



Owner Stathis Antonakopoulos at the first Carnegie Diner location on W57th Street. Photo: Naty Caez

9.      Carnegie Diner 57 LLC is a New York limited liability company with an address at 205 West 57th Street, New York, New York 10018—the site of the first Carnegie Diner restaurant.  Carnegie Diner 57 filed a certificate of assumed name with the state of New York assuming the name "Carnegie Diner & Cafe."  On information and belief, Carnegie Diner 57 is owned and/or managed by Defendant Mr. Antonakopoulos and Defendant Carnegie Hospitality.  On information and belief, Carnegie Diner 57 operates the Carnegie Diner restaurant located at 205 West 57th Street, New York, New York 10018 under the direction and supervision of Carnegie Hospitality and Mr. Antonakopoulos.  On information and belief, Carnegie Diner 57 sells goods

---

[1] https://w42st.com/post/pastrami-new-carnegie-diner-cafe-hells-kitchen-8th-avenue/.

and services under the Infringing Marks in this judicial district, as well as to consumers who have traveled from other states.

10.    Carnegie Diner 828 LLC is a New York limited liability company with an address at 828 8th Avenue, New York, New York 10019—the site of the Carnegie Diner Times Square restaurant.  Carnegie Diner 828 filed a certificate of assumed name with the state of New York assuming the name "Carnegie Diner & Cafe."  On information and belief, Carnegie Diner 828 is owned and/or managed by Defendant Mr. Antonakopoulos and Defendant Carnegie Hospitality. On information and belief, Carnegie Diner 828 operates the Carnegie Diner restaurant located at 828 8th Avenue, New York, New York 10019 under the direction and supervision of Carnegie Hospitality and Mr. Antonakopoulos.  On information and belief, Carnegie Diner 828 sells goods and services under the Infringing Marks in this judicial district, as well as to consumers who have traveled from other states.

11.    Carnegie Diner Secaucus, LLC is a New Jersey limited liability with an address at 700 Plaza Dr., Secaucus, New Jersey 07094.  On information and belief, Carnegie Diner Secaucus is owned and/or managed by Defendant Mr. Antonakopoulos and Defendant Carnegie Hospitality. On information and belief, Carnegie Diner Secaucus operates the Carnegie Diner restaurant located at 700 Plaza Dr., Secaucus, New Jersey 07094 under the direction and supervision of Carnegie Hospitality and Mr. Antonakopoulos.  On information and belief, Carnegie Diner Secaucus sells goods and services under the Infringing Marks within the state of New Jersey, as well as to consumers who have traveled from other states.

12.    Carnegie Diner Vienna LLC is a Virginia limited liability company.  Carnegie Diner Vienna's articles of organization list "Efstathios Antonakopoulos 501 Maple Ave W, Vienna, VA, 22180, USA" as its address, and the articles of organization state they were "executed

in the name of the limited liability company" by Defendant Mr. Antonakopoulos.  Carnegie Diner

Vienna has filed a fictitious name certificate with the Commonwealth of Virginia, adopting the

fictitious name "Carnegie Diner."  On information and belief, Carnegie Diner Vienna is owned

and/or managed by Defendant Mr. Antonakopoulos and Defendant Carnegie Hospitality.  On

information and belief, Carnegie Diner Vienna operates the Carnegie Diner restaurant located at

501 Maple Ave W, Vienna, Virginia, 22180 under the direction and supervision of Mr.

Antonakopoulos and Carnegie Hospitality.  On information and belief, Carnegie Diner Vienna

sells goods and services under the Infringing Marks within the Commonwealth of Virginia, as well

as to consumers who have traveled from other states.

## JURISDICTION AND VENUE

13.     This is an action arising under the Lanham Act 15 U.S.C. § 1051 *et seq.*  This Court

has original jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28

U.S.C. §§ 1331, 1338(a).  This court also has subject matter jurisdiction under 28 U.S.C. §§ 2201

and 2202.  This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C.

§§ 1338(b) and 1367(a).

14.     This Court has personal jurisdiction over Carnegie Hospitality because, on

information and belief, its principal place of business, operations, and corporate decision-making

is based in New York City. Carnegie Hospitality owns, manages, and/or operates two infringing

and diluting Carnegie Diners in New York City and this district and has advertised its plans to

open at least two additional locations in the city, with one currently labeled as "Coming Soon."

On marketing emails for the Carnegie Diners, Carnegie Hospitality lists its address as being in

New York City.  On information and belief, Carnegie Hospitality has continuous and systematic

contacts with New York, including additional restaurants and "ghost kitchens" under other brands,

including but not limited to Pizza & Shakes, located at 209 W 57th St., New York, New York

10019, and Organic Burger and NYC Pancake House, which both operate out of the first Carnegie Diner location at 205 W. 57th St., New York, New York 10019. On information and belief, Carnegie Hospitality transacts business within New York and within this district, has committed trademark infringement (and the other allegations in this Complaint) within New York, has committed trademark infringement (and other violations) outside of New York causing harm to Carnegie Hall—a New York corporation—which it reasonably should have expected to have consequences in New York and in this district, derives substantial revenue from interstate commerce, and leases real property situated within New York and this district that is the subject of the causes of action in this Complaint.

15.     This Court has personal jurisdiction over Defendant Mr. Antonakopoulos because he is generally present in and regularly transacts business within New York City through his operation, management, and oversight of at least two Carnegie Diners located in this district (as well as at least two other locations that Defendants are planning in New York City), as well as Carnegie Hospitality's other restaurants and ghost kitchens located in this district. Furthermore, this Court has jurisdiction over Mr. Antonakopoulos because he has committed trademark infringement (and the other allegations in this Complaint) within New York City and this district by selecting the Infringing Marks employed by the Carnegie Diners in this district that he operates, manages, and oversees. Mr. Antonakopoulos also has committed trademark infringement (and the other allegations in this Complaint) outside of New York causing harm to Carnegie Hall—a New York corporation—which he reasonably should have expected to have consequences in New York and in this district. On information and belief, Mr. Antonakopoulos derives substantial revenue from interstate commerce through his ownership, management, and/or operation of Carnegie Diners, Carnegie Hospitality, and Individual-Restaurant LLC Defendants in multiple states

(including in New York), which are advertised throughout the United States online and on social media (including in particular in New York). In addition, Mr. Antonakopoulos, by and through his ownership, management, and/or operation of Carnegie Hospitality and the Individual-Restaurant LLC Defendants, leases real property situated in New York and in this district that is the subject of the causes of action in this Complaint.

16.     This Court has personal jurisdiction over Carnegie Diner 57 because it is a New York limited liability company. On information and belief, Carnegie Diner 57 operates, manages, and/or owns the infringing and diluting Carnegie Diner restaurant located at 205 West 57th Street, New York, New York 10018, which is located in this district.

17.     This Court has personal jurisdiction over Carnegie Diner 828 because it is a New York limited liability company. On information and belief, Carnegie Diner 828 operates, manages, and/or owns the infringing and diluting Carnegie Diner restaurant located at 828 8th Avenue, New York, New York 10019, which is located in this district.

18.     This Court has personal jurisdiction over Carnegie Diner Secaucus because it is a necessary party to this action, and because it has committed trademark infringement (and the other allegations in this Complaint) within New York, including, but not limited to advertising and marketing its restaurant to New York residents, and has committed trademark infringement (and the other allegations in this Complaint) outside of New York causing harm to Carnegie Hall—a New York corporation—which it reasonably should have expected to have consequences in New York and in this district. On information and belief, along with Carnegie Hospitality and Mr. Antonakopoulos, Carnegie Diner Secaucus operates, manages, and/or owns the Carnegie Diner restaurant located at 700 Plaza Dr., Secaucus, New Jersey 07094, which employs the Infringing

Marks, and Carnegie Diner Secaucus is thus, additionally, a necessary party to this action to afford Carnegie Hall full relief.

19.    This Court has personal jurisdiction over Carnegie Diner Vienna because it has committed trademark infringement (and the other allegations in this Complaint) within New York, including, but not limited to advertising and marketing its restaurant to New York residents, and has committed trademark infringement (and the other allegations in this Complaint) outside of New York causing harm to Carnegie Hall—a New York corporation—which it reasonably should have expected to have consequences in New York and in this district.  On information and belief, along with Carnegie Hospitality and Mr. Antonakopoulos, Carnegie Diner Vienna operates, manages, and/or owns the Carnegie Diner restaurant located at 501 Maple Ave W, Vienna, Virginia 22180, which employes the Infringing Marks, and Carnegie Diner Vienna is thus, additionally, a necessary party to this action to afford Carnegie Hall full relief.

20.    Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to Carnegie Hall's claims occurred in this judicial district, and a substantial part of the property that is the subject of this action is situated in this judicial district.  Further, Carnegie Hospitality, Carnegie Diner 57, and Carnegie Diner 828 maintain a place of business in this judicial district at the direction of their owner, Mr. Antonakopoulos, and Defendants have committed trademark infringement (and the other allegations in this Complaint) in this district, which have harmed Carnegie Hall in this district.

## FACTS COMMON TO ALL CLAIMS

### I.    Carnegie Hall and Its CARNEGIE HALL Marks

21.    Carnegie Hall's claims arise out of Defendants' unfair competition and willful infringement and dilution of Carnegie Hall's well-known, distinctive, and famous registered and common law CARNEGIE HALL Marks in the United States, including but not limited to U.S.

Reg. Nos. 1,599,952, 1,818,456, 2,358,244, and 6,046,767, and its brand identity and imagery. Such conduct harms Carnegie Hall and its trademarks, as well as innocent consumers who are likely to be confused and deceived into thinking Defendants' goods and services are provided, sponsored, or endorsed by, or affiliated with Carnegie Hall.

<u>**Carnegie Hall's History**</u>

22.     "Carnegie Hall" is one of the most iconic names and brands in the country, including in New York, New Jersey, and Virginia, providing its goods and services to consumers throughout the United States.  As a result of 130 years of world-class performances, Carnegie Hall is so associated with musical excellence that its reputation spawned the well-known saying: "How do you get to Carnegie Hall?  Practice, practice, practice."

23.     Carnegie Hall's physical location in New York City is a world-famous performance venue and a city, state, and national historic landmark.  Home to three iconic stages—the renowned Stern Auditorium / Perelman Stage, the intimate Weill Recital Hall, and the innovative Zankel Hall—Carnegie Hall is widely recognized as one of the most celebrated music venues in the world. For 130 years, its stages have welcomed some of the world's finest artists, from Tchaikovsky, Dvořák, Mahler, and Bartók, to George Gershwin, Billie Holiday, Benny Goodman, Judy Garland, and The Beatles.  Carnegie Hall has also welcomed renowned artists such as Led Zeppelin, Jethro Tull, Neil Young, Elton John, David Bowie, Bruce Springsteen, Björk, Jay-Z, Busta Rhymes, Queen Latifah, Natalia Lafourcade, Bob Dylan, and more.

24.     As a national, state, and city landmark, both Carnegie Hall's exterior and interior are integral to its brand and widely recognized as associated with the CARNEGIE HALL Marks. In fact, Carnegie Hall's immense goodwill and cultural significance are responsible for the creation of New York historical preservation law in the 1960s, when a coalition led by Eleanore Roosevelt successfully lobbied New York state to pass legislation designed to allow for the preservation of

Carnegie Hall and similar historically and aesthetically important buildings.  A widely recognized

view of the exterior of Carnegie Hall from West 57th Street and 7th Avenue, which has been used

in Carnegie Hall's marketing and merchandise, is shown below.

**Carnegie Hall - Exterior**



25.    Carnegie Hall's renowned Stern Auditorium / Perelman Stage has hosted

countless historic concerts and events since the 1890s, from classical music to popular and

world-music concerts, comedy shows, major film and TV screenings, to benefits, and business

meetings.  Carnegie Hall's Stern Auditorium / Perelman Stage is widely recognized as one of

the finest stage and event spaces in the country and is indelibly associated with Carnegie Hall

and its goods and services.  The Stern Auditorium / Perelman Stage has been featured in

numerous well-known films and television programs, as detailed further below, and its use as a

setting immediately communicates to viewers that the character has reached the pinnacle of

artistic success.  A photograph of the interior of Carnegie Hall's Stern Auditorium / Perelman

Stage, which has been featured in Carnegie Hall marketing materials and merchandise, is shown

below.

**Stern Auditorium / Perelman Stage**



### The CARNEGIE HALL Marks

26.     The Carnegie Hall Entities have continuously and exclusively used the CARNEGIE

HALL Marks throughout the course of their 130-year history.  All of the Carnegie Hall Entities'

goods and services have been branded under the CARNEGIE HALL Marks.  The CARNEGIE

HALL Marks enjoy both extensive common law rights and federally registered rights.

27.     Throughout the brand's long history, the CARNEGIE HALL Marks have been

regularly featured in the Carnegie Hall Entities' advertising and marketing materials, such as

pamphlets, brochures, Playbills, websites, posters, social media, and more.  As detailed further

below, the CARNEGIE HALL Marks also are featured on merchandise, and used in connection

with a wide variety of goods and services.

28.     In recognition of Carnegie Hall's rights, the United States Patent and Trademark Office ("USPTO") has granted it numerous trademark registrations for the CARNEGIE HALL Marks.  Many of these registrations have become incontestable within the meaning of Section 15 of the Lanham Act, 15 U.S.C. § 1065, meaning that their distinctiveness, and Carnegie Hall's ownership and right to exclusively use the marks cannot be challenged.  Attached hereto as **Exhibit A** are copies of the registrations for the registered CARNEGIE HALL Marks at issue in this litigation (the "Registered CARNEGIE HALL Marks"), which are also listed below.

| Mark | Filing Date | Reg. Date/No. | Date of First Use | Goods and Services |
|------|-------------|---------------|-------------------|--------------------|
| CARNEGIE HALL | March 1, 1989 | June 5, 1990<br><br>Reg. No. 1,599,952 | January 8, 1895 | Int'l Class: 41<br>Concert and performance hall rental services; theatrical ticket agency services; recording studio services; organizing and conducting musical concerts, orchestral concerts, dance performances, fashion shows, and competitions and award ceremonies in the field of music; production services for shows, radio programs, film and video tape programs; providing instruction services, classes, lecture, and seminars in the field of music |
| CARNEGIE HALL | June 4, 1990 | Jan. 25, 1994<br><br>Reg. No. 1,818,456 | September 1, 1990 | Int'l Class: 16<br>printed matter; namely, posters, paper bags, and paperweights |
| CARNEGIE HALL | January 30, 1998 | June 13, 2000<br><br>Reg. No. 2,358,244 | September 1, 1990 | Int'l Class: 9<br>Musical sound recording, namely, pre-recorded phonograph records, audio tapes, video cassettes, compact discs and laser discs featuring music; educational products for children, namely, pre-recorded audio and video cassettes, video discs, optical discs for transmitting and reproducing text, sound and/or images, interactive cd-rom and computer software in the field of music, featuring directories, |

| Mark | Filing Date | Reg. Date/No. | Date of First Use | Goods and Services |
|---|---|---|---|---|
| | | | | histories, and other information related to musical events, products, and persons<br><br>Int'l Class: 16<br>Book about music; calendars; coloring books; graphic art reproductions; greeting cards; note pads; paper napkins; bookmarks; pencils; pens; postcards; crossword puzzles; sheet music; educational products featuring coloring and activity books, flash cards, stickers, workbooks, activity and informational kits, all featuring and relating to musical events, products, and people; paper banners; fiction and non-fiction books featuring information related to musical events, products, and people; instructional and teaching materials composed of text and/or pictorial representations all in the field of music and related to musical events, products, and people<br><br>Int'l Class: 18<br>Carry all bags; tote bags; wallets; umbrellas; billfolds, key cases<br><br>Int'l Class: 25<br>T-shirts, shirts; hats; caps; jackets; sweaters; scarves; ties, socks<br><br>Int'l Class: 28<br>stuffed toys; christmas tree ornaments; board games; music box toys; card games; dolls; play figures; wind-up toys; jigsaw puzzles; musical toys |
| CARNEGIE HALL | October 2, 2019 | May 5, 2020<br><br>Reg. No. 6,046,767 | September 13, 2012 (Class 9)<br><br>September 20, 2012 (Class 14) | Int'l Class: 9<br>Cell phone holders, opera glasses and magnets<br><br>Int'l Class: 14<br>Charms, namely, charms for jewelry and charms for key chains; lapel pins |

| Mark | Filing Date | Reg. Date/No. | Date of First Use | Goods and Services |
|---|---|---|---|---|
| | | | October 30, 2013 (Class 18)<br><br>September 17, 2012 (Class 20)<br><br>June 1, 2005 (Class 21)<br><br>September 10, 2012 (Class 28) | Int'l Class: 18<br>Luggage tags<br><br>Int'l Class: 20<br>Personal compact mirror<br><br>Int'l Class: 21<br>Insulated water bottles sold empty, metal water bottles sold empty, coasters not of paper or textile, drinking flasks, shot glasses, mugs and boxes for mint candies<br><br>Int'l Class: 28<br>Golf balls |
| CARNEGIE HALL+ | December 6, 2021 | January 2, 2024<br><br>Reg. No. 7,263,101 | December 8, 2021 | Int'l Class: 9<br>Downloadable software applications for streaming of audio, video, and audiovisual material, namely, musical, narrative, documentary and artistic recorded audiovisual performances via a paid subscription video on-demand service<br><br>Int'l Class: 38<br>Streaming of audio, video, and audiovisual material via the Internet, namely, delivery of musical, narrative, documentary and artistic recorded audiovisual performances via a paid subscription video on-demand service<br><br>Int'l Class: 41<br>Provision of non-downloadable musical, narrative, documentary and artistic recorded audiovisual performances via a paid subscription video on-demand service |
|  | January 15, 2021 | July 15, 2021<br><br>Reg. No. 6,804,867 | December 16, 2021 (Classes 9, 10, 14, 16, 18, 20, | Int'l Class 9: Cell phone holders, opera glasses and magnets; sound recordings, namely, pre-recorded compact discs featuring music; video recordings, namely, pre-recorded DVD's featuring |

| Mark | Filing Date | Reg. Date/No. | Date of First Use | Goods and Services |
|---|---|---|---|---|
| | | | 21, 25, 28) <br><br> June 8, 2021 (Class 41) | music; prerecorded phonograph records, compact discs featuring music; educational products for children, namely, pre-recorded audio and video cassettes, video discs, optical discs for transmitting and reproducing text, sound and/or images, interactive CD-ROMs and recorded and downloadable computer software in the field of music, featuring directories, histories, and other information related to musical events, products, and persons <br><br> Int'l Class 10: Fashion face masks being sanitary masks for protection against viral infection <br><br> Int'l Class 14: Charms and lapel pins for jewelry <br><br> Int'l Class 16:  Printed matter, namely, posters made of paper and paper bags; paperweights; books about music; printed coloring books; graphic art reproductions; printed greeting cards; printed note pads; bookmarks; pencils; pens; printed postcards; printed sheet music; educational products featuring coloring and activity books, flash cards, stickers, workbooks, activity and informational kits, all featuring and relating to musical events, products, and people; paper banners; series of printed fiction and non-fiction books featuring information related to musical events, products, and people; printed instructional and teaching materials composed of text and/or pictorial representations all in the field of music and related to musical events, products, and people |

| Mark | Filing Date | Reg. Date/No. | Date of First Use | Goods and Services |
|------|-------------|---------------|-------------------|--------------------|
|  |  |  |  | Int'l Class 18: Luggage tags; carry-all bags; tote bags; wallets; umbrellas; billfolds, key cases |
|  |  |  |  | Int'l Class 20: Personal compact mirrors |
|  |  |  |  | Int'l Class 21: Reusable and insulated water bottles and metal water bottles sold empty; coasters not of paper or textile, flasks, shot glasses, mugs and boxes for mint candies sold empty |
|  |  |  |  | Int'l Class 25: T-shirts, shirts; hats; caps; jackets; sweaters; scarves; ties; suspenders; socks |
|  |  |  |  | Int'l Class 28: Golf balls; three-dimensional puzzles; stuffed toys; Christmas tree ornaments; board games; music box toys; card games; plush toys for children made of felt; dolls; play figures; wind-up toys; jigsaw puzzles; manipulative puzzles; musical toys; paper dolls |
|  |  |  |  | Int'l Class 41: Entertainment, namely, live music concerts; educational services, namely, conducting classes in the field of music; organizing and conducting musical programs, namely, auditions, training and tour performances for young musicians who perform together as a symphony orchestra; concert and performance hall rental services; theatrical ticket agency services; recording studio services; organizing and conducting musical concerts, orchestral concerts, dance performances, fashion shows, and competitions and award ceremonies in the field of music; Entertainment services in the nature of the production of shows, radio |

| Mark | Filing Date | Reg. Date/No. | Date of First Use | Goods and Services |
|------|-------------|---------------|-------------------|--------------------|
| | | | | programs, film and video tape programs; providing instruction services, classes, lecture, and seminars in the field of music; Entertainment and education services, namely, a multimedia program series featuring orchestra, opera, jazz, folk music, great composers, period styles of music and instrumentals, together with appropriate commentary, text, or animated graphic images distributed via Internet and to intranets |
| LIVE AT CARNEGIE HALL | October 6, 2005 | February 23, 2010<br><br>Reg. No. 3,753,335 | May 24, 1990 | Int'l Class: 9<br>Sound recordings, namely, compact discs featuring music; video recordings, namely, dvd's featuring music |
| CARNEGIE HALL LISTENING ADVENTURES | December 26, 2000 | April 15, 2003<br><br>Reg. No. 2,707,933 | December 1, 2001 | Int'l Class: 41<br>Providing interactive multimedia educational and entertainment services to the internet and to intranets, featuring orchestra, opera, jazz, folk music, great composers, period styles of music and instrumentals, together with appropriate commentary, text, or animated graphic images |

29.     The USPTO accepted and registered Carnegie Hall's applications for the Registered CARNEGIE HALL Marks without proof of secondary meaning, reflecting that the CARNEGIE HALL Marks are inherently distinctive when used in connection with Carnegie Hall's goods and services.

30.     The CARNEGIE HALL Marks are instantly recognizable as the source of Carnegie Hall's goods and services.  As a result of the Carnegie Hall Entities' widespread and continuous use of the CARNEGIE HALL Marks in connection with their goods and services for over a century, and the significant promotion, advertising, third-party acclaim, and commercial success thereunder,

the CARNEGIE HALL Marks have developed tremendous goodwill and achieved recognition and acclaim in the United States, including in New York, New Jersey, and Virginia.  This makes them distinctive in the minds of consumers and famous among the general consumer population in the United States, as well as specifically in New York, New Jersey, and Virginia.

31.    Carnegie Hall—a non-profit whose mission is to present extraordinary music and musicians on the three stages of its legendary venue, to bring the transformative power of music to the widest possible audience, to provide visionary education programs, and to foster the future of music through the cultivation of new works, artists, and audiences all through a wide variety of goods and services—has invested extensively in its brand and trademarks.  As a result of Carnegie Hall's efforts building and investing in its CARNEGIE HALL Marks, as well as the Carnegie Hall Entities' widespread, continuous, and exclusive use thereof, CARNEGIE HALL has become a famous and distinctive name and trademark.

**Publicity and Promotion for Carnegie Hall and Its CARNEGIE HALL Marks**

32.    The Carnegie Hall Entities have offered goods and services under the CARNEGIE HALL Marks throughout the past 130 years, earning Carnegie Hall substantial goodwill and recognition across the country and making it a well-known and famous brand.

33.    Since the Carnegie Hall performance venue opened in the 1890s, the Carnegie Hall Entities have sold millions of tickets to consumers from across the country, as well as internationally.  Carnegie Hall has spent, and continues to spend, significant amounts on advertising and promoting its brand.

34.    As a well-known and famous brand, Carnegie Hall also regularly receives both solicited and unsolicited media coverage.  Such coverage has been featured in nationally distributed publications like *The New York Times*, *Los Angeles Times*, *Condé Nast Traveler*, and *The New Yorker*; segments featured on local and national news networks, including PBS, NBC

News, CBS Sunday Morning, and CNN; and popular tourism and entertainment websites such as Trip Advisor, nyctourism.com and cititour.com.  For instance, *Condé Nast Traveler* wrote, "[s]ince opening in 1891, Carnegie Hall has become synonymous with musical achievement[.]" [2] Nyctourism.com also lauded Carnegie Hall as a "world-famous concert venue," a "New York City landmark," and a "must-see music attraction."[3]

35.    Numerous online publications have provided media coverage for various goods and services offered by Carnegie Hall.  For example, the Carnegie Hall Joan and Sanford I. Weill Café ("Weill Café," which is discussed further below) has appeared in publications discussing dining options, such as *The New York Times*, Eater, and TimeOut.

36.    Numerous third-party travel websites have also provided coverage, reviewing and promoting Carnegie Hall's goods and services, including Trip Advisor, Expedia, Yelp, and Resy. As shown below, Trip Advisor describes Carnegie Hall as a "landmark performance center," which includes "[s]uperb restaurants, a museum and gift shop[.]"[4]



[2] https://www.cntraveler.com/activities/new-york/carnegie-hall.
[3] https://www.nyctourism.com/places/carnegie-hall/.
[4] https://www.tripadvisor.com/Attraction_Review-g60763-d116237-Reviews-Carnegie_Hall-New_York_City_New_York.html.

37.     Owing to its fame and success, the Carnegie Hall performance venue and the CARNEGIE HALL Marks have been featured in numerous award-winning TV shows and films, including but not limited to *Carnegie Hall* (1947), *Music of the Heart* (1999), *Florence Foster Jenkins* (2016), *Green Book* (2018), *The Marvelous Mrs. Maisel* (2022), *American Symphony* (2023), and *Maestro* (2023), among others.  Such TV shows and films have achieved critical acclaim and have been widely viewed.  For example, *Green Book* grossed over $320 million worldwide and won the award for Best Picture at both the Oscars and Golden Globes.  *Florence Foster Jenkins* (starring Meryl Streep) was nominated for 48 awards, winning 10, and *Maestro* (starring Bradley Cooper and Carey Mulligan) was nominated for seven Oscars.  *The Marvelous Mrs. Maisel* was nominated for 278 awards, winning 104, including winning the Golden Globe for Best Television Series – Musical or Comedy twice, and its third season was watched by up to 3.2 million viewers in the first week alone.[5]

**Carnegie Hall's Goods and Services Offered Under the CARNEGIE HALL Marks**

38.     The Carnegie Hall Entities offer a wide variety of goods and services under the CARNEGIE HALL Marks.  For example, an evening at Carnegie Hall's iconic performance venue is more than just an opportunity to see a performance.  Consumers can experience a prix fixe pre-concert dining menu at the Carnegie Hall Weill Café, grab a drink or a quick bite at one of Carnegie Hall's six intermission bars, peruse items from Carnegie Hall's archival collection in the Rose Museum, and purchase merchandise and souvenirs from the in-person or online gift shop.

39.     Carnegie Hall also offers goods and services to consumers nationwide who are unable to attend in person.  Those consumers are able to experience performances online via the Carnegie Hall+ streaming service or on the radio via Carnegie Hall Live (broadcasted and

---

[5] https://www.thewrap.com/the-marvelous-mrs-maisel-season-3-was-watched-by-3-2-million-viewers-its-first-week-nielsen-says/

produced by WQXR and Carnegie Hall); listen to Carnegie Hall's *If This Hall Could Talk*, *Afrofuturism*, *Great Music Teaching*, and other podcasts (available on all podcast platforms); and explore Carnegie Hall's official YouTube channel and Carnegie Hall Playlists (available on Apple Music and Spotify).  Carnegie Hall encourages listeners inspired by these iconic performances to launch their own musical journey through free digital content for families, educators, and young musicians offered through Carnegie Hall's Weill Music Institute.  Consumers nationwide can (and do) purchase tickets and merchandise online.

40.    Carnegie Hall's goods and services are accessible to members of the public of all backgrounds.  For example, Carnegie Hall offers concert tickets at all price points, from subscription tickets, to discount programs, to free concerts in partnership with local community organizations.  Carnegie Hall also provides programming for people of all ages and welcomes consumers from all over the country and around the world, whether they are attending a concert, dining, or simply touring the performance venue.

41.    The Carnegie Hall Entities offer a wide range of goods and services, all of which are branded and offered under the famous, distinctive, and well-known CARNEGIE HALL Marks. For example, as mentioned above, Carnegie Hall offers exceptional musical performances, including concert series curated by acclaimed and famous artists and composers; citywide festivals that feature collaborations with leading New York City cultural institutions; orchestral performances, chamber music, new music concerts, and recitals; as well as the best in jazz, world, and popular music.

42.    In addition to these performance activities, Carnegie Hall offers a wide variety of related goods and services under the CARNEGIE HALL Marks.  For instance, Carnegie Hall's Weill Music Institute, housed in the approximately 60,000-square foot Resnick Education Wing

within Carnegie Hall, offers an extensive array of music education and social impact programs that annually serve hundreds of thousands of people, playing a central role in Carnegie Hall's commitment to making great music accessible to as many people as possible. For example, Carnegie Hall's Link Up program introduces students in grades three through five to orchestral music through an immersive experience in which students nationwide come together with their local orchestras to learn about, listen to, and perform great music. Additionally, Carnegie Hall's Lullaby Project pairs new and expecting parents and caregivers with professional artists to write and sing personal lullabies for their babies, including parents in healthcare settings, homeless shelters, high schools, and correctional settings.

43.     Carnegie Hall is also home to its Susan W. Rose Archives and Museum ("Rose Museum"). Carnegie Hall's Rose Museum, which opened its doors in 1991, chronicles Carnegie Hall's history—its exhibits include concert programs, photographs, autographed posters, musical manuscripts, and video—to tell the history of Carnegie Hall and the events that made it famous. The Rose Museum is not only home to exhibitions but also an homage to all the great artists, events, and civic leaders that have built up Carnegie Hall's fame and reputation. Below is an example of an exhibit from Carnegie Hall's Rose Museum—a collage of "Live at Carnegie Hall" record album covers capturing notable performances from the past 130 years.



44.    Under the CARNEGIE HALL Marks, the Carnegie Hall Entities also offer restaurant services and various food and beverage options.  For instance, consumers can eat at the Carnegie Hall Weill Café, which offers casual breakfast and lunch options, as well as a sophisticated pre-concert dining prix fixe menu.  All of these dining options are available to both the general public and ticket holders alike.  Below is a capture of the webpage for the Carnegie Hall Weill Café, as well as a photo of the interior of the café.





45.    As shown in the examples below, the Carnegie Hall Weill Café is offered under the CARNEGIE HALL Marks, including, but not limited to through its signage, menus, employee uniforms, napkins, and promotional materials:

**Carnegie Hall Weill Café – Uniforms, Advertising, and Napkins**








# CARNEGIE HALL
## Weill Café

### Carnegie Hall's New Jewel-Box Coffee Bar

Weill Café features fresh grab-and-go pastries and breakfast breads alongside an assortment of espresso drinks, Stumptown Coffee, and other beverages. An intimate daytime dining room provides a counter-service menu of soups, salads, quiche, sandwiches, and an assortment of sweet treats—as well as specialty menus that complement Carnegie Hall's iconic history and world-class contemporary programming.

154 West 57th Street
weillcafe.com
212-424-4032

Hours:
Monday–Friday
10 AM–3 PM

# CARNEGIE HALL
## Weill Café

To view our menu and
place an order, scan here:

weillcafe.com
@weillcafe



46.     Carnegie Hall also advertises the food and beverage services available at the Carnegie Hall Weill Café via the official Carnegie Hall Instagram account, as depicted below.



47.     In addition, the Carnegie Hall Entities offer food and beverages before performances and during intermissions through six intermission bars, which are open to all concertgoers, and the Patron Lounge, which is open to certain donors and supporters.  The Carnegie Hall Entities have offered food and beverage services continuously for decades, since at least 1986.

48.     Carnegie Hall has also licensed the CARNEGIE HALL Marks to third parties, including in connection with restaurant services.  For example, Carnegie Hall has licensed the CARNEGIE HALL Marks to The Park Hyatt New York, located at 153 W. 57th St., New York, New York, in connection with the hotel's restaurant services in its The Living Room restaurant,

which featured a pre-concert prix fixe menu.  Other food, beverage, and hospitality licensing arrangements are within Carnegie Hall's natural zone of expansion as well.  An image of the Park Hyatt's menu offered under the CARNEGIE HALL Marks is below.



49.     Carnegie Hall also sells CARNEGIE HALL-branded merchandise through its Carnegie Hall Shop, as well as on its website.  Carnegie Hall's merchandise includes, but is not limited to, CARNEGIE HALL-branded t-shirts, tote bags, hats, notebooks, fridge magnets, accessories, and more.  Items available in the Carnegie Hall Shop bear the CARNEGIE HALL Marks, and many also include images of the exterior and/or interior of the Carnegie Hall

performance venue.  Below are photos of the Carnegie Hall Shop, a capture of the online storefront, and examples of CARNEGIE HALL-branded merchandise available at the Carnegie Hall Shop, including magnets, notebooks, clothing, snow globes, and holiday ornaments displaying the performance venue in connection with the CARNEGIE HALL Marks.

**The Carnegie Hall Shop**



**The Carnegie Hall Shop – Online Storefront**



**Examples of Carnegie Hall Merchandise**





50.    Carnegie Hall, as a leader in musical and cultural excellence, continues to expand its goods and services. Most recently, Carnegie Hall introduced a new subscription video-on-demand service which features streamed performances from Carnegie Hall alongside programming from other prestigious stages around the world. Carnegie Hall also offers podcast series featuring the world's most celebrated artists and educators, which further bring its goods and services to audiences all over the world. Examples of Carnegie Hall's subscription video-on-demand service, Carnegie Hall+ (available through Apple TV, Prime Video, Spectrum, Xfinity, Xumo, Verizon, Cox, Dish, Sling, and Astound Broadband), and podcast services (available via Apple Podcasts, Spotify, Pocket Casts, and Overcast) are shown below.

**Carnegie Hall+**



**Carnegie Hall Podcasts**





51.    Carnegie Hall has invested significant resources in developing and promoting its goods and services under the CARNEGIE HALL Marks across the country and around the world. The CARNEGIE HALL Marks appear in a wide variety of advertisements and promotional materials for Carnegie Hall's concerts, educational programs, museum, café, and more, including, but not limited to, brochures, websites, and social media accounts (with hundreds of thousands of followers) promoting Carnegie Hall's goods and services.   As a result of Carnegie Hall's investment, the CARNEGIE HALL Marks are one of the most recognized brands in the United States including in New York, New Jersey, and Virginia.

52.    Carnegie Hall also prominently uses images of its exterior in its social media marketing, not only in posts, but also as its YouTube and Facebook banner images, as seen in the below examples.

**Carnegie Hall – Exterior – Instagram Post**



**Carnegie Hall – Exterior – Facebook Banner Picture**



**Carnegie Hall – Exterior - X Post**



**Carnegie Hall – Exterior – Youtube Banner Photo**



53.    Carnegie Hall's social media marketing also regularly features images of the interior of Carnegie Hall's distinctive Stern Auditorium / Perelman Stage, taken from both the audience and performer's perspective, as shown in the images below that appear on Carnegie Hall's Instagram page.





54.    Carnegie Hall also partners with corporate sponsors to promote its goods and services.  For example, Carnegie Hall partners with Mastercard to offer cardholders an annual ticket presale purchasing opportunity, as well as "experience" tickets that include a three-course meal at the Carnegie Hall Weill Café, followed by a concert in Carnegie Hall's Stern Auditorium / Perelman Stage. Both are promoted via Mastercard's priceless.com platform, as well as Mastercard's email and social media marketing channels.  Carnegie Hall also partners with Bank of America to provide discounted tickets to Bank of America cardholders, which Carnegie Hall and Bank of America promote on their respective websites, at Bank of America branches, and on Carnegie Hall's social media channels.  Carnegie Hall has also partnered with the United Airlines MileagePlus Exclusives program to offer consumers concert tickets in exchange for airline miles.

55.    Carnegie Hall's various educational programs also team with partners across the country and around the world, including with regional and national orchestras and symphonies.

Carnegie Hall's partnerships with teaching artists and arts organizations are designed to bring Carnegie Hall's programming and resources to communities, schools, and school districts across the country, as well as abroad.

## II.    Defendants' Willful Infringement of the CARNEGIE HALL Marks

56.    On information and belief, without Carnegie Hall's authorization, Defendants opened their first Carnegie Diner at 205 West 57th Street in New York City, across the street from Carnegie Hall.

57.    What began as a single diner across the street from Carnegie Hall has even more recently expanded into a chain of Carnegie Hall-themed restaurants across New York City, as well as in New Jersey and Virginia, with plans to expand to all 50 states (and even internationally).  On information and belief, Defendants have gradually expanded, now with locations in New York, New Jersey, and Virginia.  On information and belief, Defendants opened their second Carnegie Diner located in Secaucus, New Jersey.  On information and belief, Defendants opened a third Carnegie Diner location in Times Square, New York.  On information and belief, Defendants opened a fourth Carnegie Diner location in Vienna, Virginia.  On information and belief, Defendants have announced plans to open another (fifth) location in New York City location—located at 1185 Avenue of the Americas—and have plans for another (sixth) location in New York City as well.

58.    Moreover, in an April 2024 interview, Defendant Mr. Antonakopoulos stated that Carnegie Hospitality "just signed a nationwide franchise contract. By the end of summer 2024, we'll start franchising Carnegie Diner & Café. *We believe we can have one location in every state—at least.  That's our goal over five years*," and stated that Defendants intend to open

locations internationally as well, beginning in Greece.[6]  These expansion plans were developed despite Carnegie Hall's complaints and repeated attempts to reach an amicable resolution (before Defendants apparently signed a nationwide franchise contract), as well as growing consumer confusion and association with Carnegie Hall.

59.     On information and belief, Defendants built Carnegie Diner's brand on the goodwill and reputation of Carnegie Hall and its CARNEGIE HALL Marks, intending to trade off of Carnegie Hall's famous brand.  For example, in an interview with *Northern Virginia Magazine*, Carnegie Hospitality's owner, Defendant Mr. Antonakopoulos, admitted that Carnegie Diner began with "***an idea to pay homage to Carnegie Hall***."[7]  In another interview with *On New Jersey*, Mr. Antonakopoulos described Carnegie Diner as "***all about the music of Carnegie Hall***," stating that Defendants "***created [their] brand and [their] restaurants***" by "***paying an homage to all the people who played at [Carnegie Hall]***."[8]

60.     This is no "homage"; it is theft.  Defendants admit to knowingly creating a chain of restaurants named after Carnegie Hall, with images of Carnegie Hall and its famous performances, specifically to draw a connection between the two brands.  Defendants are using the intellectual property and goodwill of a non-profit institution for their own financial advantage and profit, paying nothing to Carnegie Hall and diluting the trademark and brand that the Carnegie Hall Entities have built over more than a century.  Just as Defendants would not be permitted to open an unlicensed Disney-themed café (much less profit off a franchised chain of such cafés), Defendants cannot brazenly exploit the CARNEGIE HALL Marks and brand for their own

---

[6] https://www.estiator.com/hitting-the-high-notes/ (emphasis added).
[7] https://northernvirginiamag.com/food/food-news/2024/05/23/viennas-carnegie-diner-is-almost-open/ (emphasis added).
[8] https://www.youtube.com/watch?v=F82CdWFFv9o at 3:47.

commercial gain and take advantage of patrons that are likely to think it is affiliated with Carnegie Hall. To do so constitutes willful infringement, dilution, and unfair competition.

61.    The word "CARNEGIE" is, notably, the most prominent aspect of Defendants' Carnegie Diner logo, appearing in larger, bold-faced font, contrasting with the smaller, non-bolded "DINER & CAFE," as depicted below.



62.    To be clear, Carnegie Diner does not merely utilize the name "Carnegie"—it is *themed* around Carnegie Hall. Its décor, branding strategy, and merchandise all focus on and trade off of Carnegie Hall, including its trademarks and brand.

63.    Defendants' unlicensed restaurants include intentional and extensive use of the Infringing Marks, including full-wall-size murals of the exterior and interior of the Carnegie Hall performance venue and other indicia suggesting that the Carnegie Diners and Carnegie Hall are affiliated with one another or that Carnegie Hall endorses the Carnegie Diners' use of the Infringing Marks. As discussed in detail below, Defendants have also used these images of Carnegie Hall in their social media alongside Carnegie Hall hashtags and location tags to reinforce an association with Carnegie Hall and attract consumers searching for content related to Carnegie Hall.

64.    Defendants' use of the Infringing Marks in connection with the Carnegie Diners is likely to cause consumer confusion because such use leads them to mistakenly believe that there is a connection, sponsorship, or association between Defendants and Carnegie Hall, or that the Carnegie Diners are owned, operated, sponsored, endorsed by, or affiliated with Carnegie Hall, when that is not the case.

65.    Consumer confusion is particularly likely given Defendants' extensive efforts to trade on Carnegie Hall's goodwill and reputation, including the use of highly similar (and in relevant part identical) trademarks, imagery and other marketing collateral that reinforce a nonexistent association with Carnegie Hall.  Moreover, the similarity of the goods and services offered by Defendants to those of Carnegie Hall, the target customers of those goods and services, and the way Defendants' goods and services are marketed, advertised, and promoted, including the channels of trade in which they appear under the Infringing Marks increase even further the likelihood of such confusion.

66.    For example, as shown below, each Carnegie Diner location extensively uses the Infringing Marks, including full-wall mural images of the interior of Carnegie Hall, which make it seem like consumers are eating at Carnegie Hall.  The Times Square and Secaucus, New Jersey locations also feature large mural images of the exterior of Carnegie Hall, as shown below.

**Carnegie Diner at 205 West 57th Street, New York City**



**Carnegie Diner in Times Square, New York City**





**Carnegie Diner in Secaucus, New Jersey**





**Carnegie Diner in Vienna, Virginia**



67.    Defendants' use of full-wall-size images has even led to the room shown in the above photograph of the Carnegie Diner location in Vienna, Virginia, becoming known as the "Carnegie Hall room" among customers, which makes sense given the large photograph of Carnegie Hall's famous stage.[9]

68.    In fact, on information and belief, Defendants designed the wall-sized murals in part as a marketing tool, by which they encourage consumers to take and post photographs of themselves at Carnegie Diner that make it look like they are actually on the famous Carnegie Hall stage.  Below are images appearing in social media posts from the accounts of Defendant Mr. Antonakopoulos and consumers taken in front of these murals in which the subjects tag themselves

---

[9] https://www.yelp.com/biz/carnegie-diner-and-cafe-vienna?hrid=oqRY5tHVn4DxlfXsRaBEgA&utm_campaign=www_review_share_popup&utm_medium=copy_link&utm_source=(direct).

as being at Carnegie Diners.  The first image is from Mr. Antonakopoulos's Instagram account and depicts him, second from the left.









69.     Not only do Defendants encourage consumers to pose and photograph themselves in front of Defendants' unauthorized replicas of Carnegie Hall's famous Stern Auditorium / Perelman Stage, but Defendants also use these replicas heavily in their own online marketing.  For example, the official Carnegie Diner Instagram account features images of celebrity guests, using the replica as a backdrop, as seen in the below examples featuring actor Matthew Broderick and UFC Heavyweight Champion Jon Jones.



70.     Marketing videos for Carnegie Diner, posted on social media, also have focused on

these blown-up images of Carnegie Hall, leading consumers to believe that the posts depict

Carnegie Hall's famous Stern Auditorium / Perelman Stage, when in fact, the videos were taken

at a Carnegie Diner location.  Below are screenshots of the thumbnails for promotional videos featured on Carnegie Diner's official Instagram account.

| *DMV Adventures* Review | Carnegie Diner Promotional Video |



71.    Indeed, this first image, promoted on Carnegie Diner's Instagram page, is for a video review of the Vienna, Virginia location, by *DMV Adventures*.  The reviewer states "***I'm eating on the stage of Carnegie Hall***," while using the wall-sized mural as a backdrop for his video review.

72.    Defendants also use their full-wall murals of the exterior of Carnegie Hall as part of their marketing strategy.  Below is an image from the Carnegie Diner Instagram account, featuring a photograph of the winner of a Carnegie Diner gift card in front of the mural of Carnegie Hall's exterior.



73.     In addition, with the intent to misrepresent their goods and services as connected to Carnegie Hall, Defendants have covered the Carnegie Diners' walls with collages of photographs of Carnegie Hall, as well as posters, advertisements, and photographs of famous musicians and other celebrities who have appeared at Carnegie Hall throughout the years.  Examples of such collages are shown below:





74.    Defendants' restaurants also sell merchandise that trades off of the CARNEGIE HALL Marks and is confusingly similar to that sold in-person and online by the Carnegie Hall Shop.   For instance, Carnegie Diner merchandise has focused on Carnegie Hall and Carnegie Hall's landmark status, tying its own brand to that of Carnegie Hall.   For example, Defendants have sold a t-shirt, depicted below, with "CARNEGIE" spelled out in yellow subway line bubbles, with "A NEW YORK CITY LANDMARK" written underneath.   Below that, the word "CARNEGIE" appears prominently, with "Diner and Café" in small letters below that.   The "landmark" referred to is clearly Carnegie Hall.



75.     Carnegie Diner also has sold merchandise that reproduces posters of famous Carnegie Hall performances and features the CARNEGIE HALL Marks on t-shirts, along with the Carnegie Diner logo beneath, thus reinforcing the (false) connection between Carnegie Hall and Carnegie Diner.  Below is an image of a t-shirt reproducing the poster advertising a famous 1974 concert, "Maria Callas at Carnegie Hall," for sale at the Carnegie Diner Times Square location.



76.     Carnegie Diner's social media marketing also has used the CARNEGIE HALL Marks, including using @carnegiehall and #carnegiehall as tags.  In addition, Carnegie Diner's social media accounts have hyperlinked to Carnegie Hall's social media pages, set Carnegie Hall as its location on posts, and have extensively referenced concerts at Carnegie Hall in an attempt to associate Carnegie Diner with Carnegie Hall and benefit from Carnegie Hall's goodwill.  For example, as shown below, in one Facebook post, Defendants wrote, "What would Carnegie Diner be without @carnegiehall?" referencing in great detail a specific performance at Carnegie Hall and urging consumers to visit Carnegie Diner as part of the experience, in a blatant attempt to trade on Carnegie Hall's trademarks, services, reputation, and goodwill.   All of this clearly communicates to consumers that Carnegie Hall has approved, sponsored, endorsed, licensed, or otherwise partnered with Carnegie Diner, when that is not the case.  Examples are shown below (with red boxes added for emphasis).





77.    Defendants' Carnegie Diner social media posts have even appeared to issue press releases on behalf of Carnegie Hall.  The following image shows a Carnegie Hall promotional poster which Defendants used in full on Carnegie Diner's social media account, along with a caption that is taken almost verbatim from Carnegie Hall's description of the concert, with the

addition of "enjoy some culture and then dinner with us after (or before)!" Red boxes have been added for emphasis.



78. Defendants have distributed other social media posts using headshots of Carnegie Hall performers, along with Carnegie Hall's registered "CH" logo (Reg. No. 6,804,867) and the hashtag "#carnegiehall," as depicted below (with red boxes added for emphasis). The use of such a hashtag attracts consumers searching for and interested in Carnegie Hall, and the blatant appropriation of Carnegie Hall's monogram logo conveys that

this is an official Carnegie Hall post, partnership, or sponsorship.



79.    Defendants also have used images of Carnegie Hall's exterior as part of their online advertising.  And Defendants have connected this imagery to Carnegie Diner social media posts that read as if they are Carnegie Hall press releases.  In the example depicted below (with red boxes added for emphasis), Carnegie Diner purports to announce Carnegie Hall's participation in @NYCGo's Must See Week promotion.  This post also uses the hashtag for Carnegie Hall twice.



80.    Defendants have also geotagged their social media posts so that Carnegie Diner appears to be located inside Carnegie Hall.  For example, the image below shows an official post by the Carnegie Diner account with its location set as "Carnegie Hall" (with red boxes added for emphasis).



81.     Further, on information and belief, Defendants have specifically targeted Carnegie Hall's customers by running promotions and discounts associated with Carnegie Hall's goods and services.   For example, as the below images show, Defendants have run unauthorized and unlicensed promotions for Carnegie Hall patrons whereby they receive a 10% discount at Carnegie Diners by showing their ticket stubs from performances at Carnegie Hall.   This is particularly likely to cause confusion given that Carnegie Hall's licensees, such as Park Hyatt, have run similar promotions.   Carnegie Diner also has offered pre-fixe pre-show menus for Carnegie Hall patrons, just like those offered by the Carnegie Hall Weill Café.   And Carnegie Diner offered free champagne to its customers to celebrate the re-opening of Carnegie Hall following the COVID pandemic.   Examples of such marketing promotions are shown below (with red boxes added for emphasis).

 



82. On information and belief, Defendant Mr. Antonakopoulos has personally created and disseminated marketing materials containing the Infringing Marks that are intended to and likely to cause consumer confusion and association between Defendants' Carnegie Diners and Carnegie Hall, such as in the images below that appear on Mr. Antonakopoulos's personal Instagram and Facebook pages (with red boxes added for emphasis).





83.    On information and belief, consumers have already mistakenly associated Carnegie Hall with Defendants' Carnegie Diners.  For example, as shown below, a pianist who played at Carnegie Hall referred to Carnegie Diner as "Carnegie hall diner" on her public Instagram account, with a photograph that prominently featured the wall mural of the interior of Carnegie Hall.



84.    Moreover, on information and belief, consumers online have also been confused and have associated Defendants' Carnegie Diners with Carnegie Hall.  Examples from reviews include:

- "The décor…makes you feel like you are in Carnegie Hall."

- "Great murals on the walls.  Named after the famous Carnegie Hall."

- "[B]earing tribute to Carnegie Hall for which it is named"

- "Loved the allusion to Carnegie Hall"

- "We were seated in their side room with a large picture of Carnegie Hall"

- "[T]he acoustics in the 'Carnegie Hall' room were such that it seemed very loud."

85.    For example, consumers have attributed the "ambiance" and "atmosphere" of Defendants' Carnegie Diners to Carnegie Hall, stating:

- "Ambiance was bright and has pictures on the walls of all the famous performers with a backdrop of Carnegie Hall."

- "[T]he atmosphere was really nice for a diner, I especially loved the music related posters like the blowup of the front and back of Harry Belafonte's Live from Carnegie Hall album."

- "They have fun and unique posters on the wall from events that took place at Carnegie hall over the years which was fun to see!"

- "Love the posters on the walls of all the great shows that took place in Carnegie Hall through the years."

86.    In addition to the likely consumer confusion and association caused by Defendants' extensive efforts to trade on Carnegie Hall's goodwill and reputation, Defendants' violative actions dilute the famous CARNEGIE HALL Marks, including by weakening consumers' brand associations of the marks. The dominant element of Defendants' Infringing Marks is identical to that of the CARNEGIE HALL Marks, and Defendants intend to create, and have actually created an association between their Carnegie Diners and Carnegie Hall that is referenced in press coverage and consumer reviews.

87.    Furthermore, Carnegie Diners have appeared in some of the same periodicals and websites in which Carnegie Hall has also appeared, such as *The New York Times*, *Time Out New*

*York*, Trip Advisor, and nyctourism.com.  Such overlap in advertising and channels of trade exacerbates the likelihood of confusion and dilution.

88.    Moreover, press coverage for Defendants' Carnegie Diners consistently references Carnegie Hall.  For example, *Eater* reported that the Carnegie Diner Virginia location will "showcase supersized photos of Carnegie Hall's iconic concert stage and portraits of past musicians performing at the centuries-old landmark venue."[10]  Cititour.com likewise reported that "[o]ne of the diner's focal walls is a from-the-stage view of the iconic Carnegie Hall and other portraits of some of the iconic musicians who have performed at the historic venue over the years."[11]  Multiple articles have also reported that Carnegie Hall is the "namesake" of the various Carnegie Diners, both in and outside of New York.[12]  All of this causes and exacerbates the likelihood of confusion and dilution of the CARNEGIE HALL Marks.

89.    Of particular concern is that Defendants use the Carnegie Hall trademarks and brand without any way for Carnegie Hall to inspect and maintain quality controls for goods and services sold in connection with its marks.  Nor is there any way for Carnegie Hall to control Defendants, which falsely and misleadingly associate the Carnegie Diners with Carnegie Hall and the CARNEGIE HALL Marks.  Defendants' uncontrolled and unlicensed use also hinders Carnegie Hall's ability to further expand and further license its brand.  At the same time, Defendants are clearly profiting off of the CARNEGIE HALL Marks and brand, not only through Defendants' sales to consumers but also by their efforts to franchise and license the Infringing

---

[10] https://dc.eater.com/2024/5/20/24161125/nyc-all-day-carnegie-diner-cafe-dc-vienna-virginia-coming-attractions.
[11] https://cititour.com/NYC_News/Carnegie-Diner-Cafe-Opens-Second-NYC-Location/7436.
[12] https://www.manhattandigest.com/2020/02/25/carnegie-diner-review/; https://www.ffxnow.com/2024/06/03/new-yorks-carnegie-diner-set-for-grand-opening-in-vienna-this-week/; https://bestofnj.com/features/food/carnegie-diner-in-secaucus-serves-classics-desserts-more/.

Marks, all despite Carnegie Hall's complaints and the growing consumer confusion and association.

90.    Defendants' unauthorized use of the Infringing Marks is likely to create negative brand associations with Carnegie Hall.  For example, in one- and two-star reviews of Carnegie Diners, consumers have tied their negative experiences to the Infringing Marks, showing how such experiences can easily then tarnish Carnegie Hall's trademarks, brand, and reputation.

- "Food was meh.  Service was terrible.  You are paying for the name."

- "Food was not good.  Carnegie in name only.  Skip this place."

- "Not at all what I thought Carnegie would ever be like…just below average everything."

- "Carnegie himself would be rolling over in his grave, what a dive, everything cold and bland… I'd tell the world if I could what a dump."

- "We were really looking forward to our brunch at Carnegie and with that name they had a lot to live up to.  While the service wasn't terrible, nearly everything else was."

91.    In furtherance of Defendants' infringement, dilution, and unfair competition, and despite beginning to provide food and beverage services more than 30 years after Carnegie Hall did so, Carnegie Hospitality obtained U.S. Registration No. 6,632,349 for CARNEGIE DINER & CAFÉ in Class 43 for "Restaurant and café services; Restaurant services; Restaurant services, including sit-down service of food and take-out restaurant services; Restaurant services, namely, providing of food and beverages for consumption on and off the premises."  Carnegie Hospitality also recently filed a new trademark application for the logo **CARNEGIE** DINER & CAFE , (U.S. Serial No. 99/040389) in class 43 for "Restaurant and cafe services; Restaurant services; Restaurant services, including sit-down service of food and take-out restaurant services; Restaurant services, namely, providing of food and beverages for consumption on and off the premises."

92.     Carnegie Hall has been trying to resolve this matter amicably for years.  Defendants'
unauthorized use of the CARNEGIE HALL Marks, however, has only become more rampant since
Carnegie Hall reached out to address Defendants' willful infringement, dilution, and unfair
competition.  As mentioned above, Defendants have opened multiple Carnegie Diners and, on
information and belief, have entered into a franchise agreement and plan to open locations in all
50 states by 2029, with the intent that consumers will associate the Carnegie Diners with Carnegie
Hall.  Defendants' actions are at the expense not only of Carnegie Hall, but importantly of innocent
consumers, such as the ones in the reviews noted above who thought they were getting a Carnegie
Hall-quality experience and then were disappointed.

93.     Carnegie Hall has had no choice but to bring this lawsuit to prevent Defendants
from further infringing and diluting its famous CARNEGIE HALL Marks, damaging its hard-
earned reputation and goodwill, and confusing and deceiving innocent consumers.  Indeed,
Defendants' brazen attempt to freeride on Carnegie Hall's brand, and its continued expansion,
makes clear that its infringement, dilution, and unfair competition—which are willful—will not
stop absent a court order.

### FIRST CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS
### INFRINGEMENT OF REGISTERED CARNEGIE HALL MARKS – 15 U.S.C. § 1114

94.     Carnegie Hall repeats and re-alleges each and every allegation set forth in
paragraphs 1 through 93 as if fully set forth herein.

95.     Carnegie Hall has prior rights over Defendants in and to the Registered
CARNEGIE HALL Marks in the United States by virtue of the Carnegie Hall Entities' continuous
use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous
federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall,

including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

96.    The Registered CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

97.    Defendants' Infringing Marks are confusingly similar to the Registered CARNEGIE HALL Marks, given the similarities between the marks, including, among other things, the similar and/or identical nature of the marks, the manners in which the marks are used, the goods and services with which they are used, the target customers of those goods and services, and the way the services under the marks are marketed, advertised, and promoted, including the channels of trade in which they appear.

98.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise and décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

99.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur.

100.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and the Individual-Restaurant LLC Defendants, caused the infringement as a whole to occur.

101.    Carnegie Hospitality and the Individual-Restaurant LLC Defendants own, manage, and/or operate the Carnegie Diners, which employ the Infringing Marks.  Carnegie Hospitality and

the Individual-Restaurant LLC Defendants, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

102.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

103.    Defendants' use of the Infringing Marks in connection with Carnegie Diners is likely to make consumers mistakenly believe there is a connection, sponsorship, or association between Defendants' Carnegie Diners and Carnegie Hall, and/or that the Carnegie Diners are owned, operated, sponsored by, endorsed by, or affiliated with, Carnegie Hall when that is not the case.

104.    Consumers have already been led to mistakenly believe there is a connection, sponsorship, or association between Defendants' Carnegie Diners and Carnegie Hall, and/or that the Carnegie Diners are owned, operated, sponsored or endorsed by, or affiliated with, Carnegie Hall.

105.    As a result of this confusion, Carnegie Hall has suffered substantial harm and damages, including to the value of its Registered CARNEGIE HALL Marks, its reputation and goodwill, and is likely to suffer additional harm and damages.

106.    Defendants had actual and constructive notice of the Registered CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

107.    Defendants knew, or should have known, that their unauthorized use of the Infringing Marks was likely to cause confusion or mistake as to Carnegie Hall's ownership, sponsorship or endorsement of, association or affiliation with Defendants' Carnegie Diner and related goods and services.

108.    Defendants' unauthorized use of the Infringing Marks was willful.

109.     Defendants' use of the Infringing Marks, unless enjoined by this Court, will further impair the value of Carnegie Hall's Registered CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

110.     Defendants' use of the Infringing Marks constitutes infringement of the Registered CARNEGIE HALL Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

111.     By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief against Defendants, and for all remedies available to it under 15 U.S.C. § 1117, including monetary damages, an accounting and disgorgement of Defendants' profits, Carnegie Hall's reasonable attorneys' fees and costs, and prejudgment interest, among other remedies as outlined below and any others ordered by the Court.

<u>**SECOND CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS**</u>
**FALSE DESIGNATION OF ORIGIN AS TO THE CARNEGIE HALL MARKS –**
**15 U.S.C. § 1125(A)**

112.     Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 111 as if fully set forth herein.

113.     The CARNEGIE HALL Marks are protected as common law trademarks by virtue of the Carnegie Hall Entities' longtime, continuous use of such marks in the marketplace.

114.     The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.   In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

115.     As discussed above, Defendants have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization.

116.     Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise and décor consisting of full-wall murals of the

interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

117.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur.

118.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and the Individual-Restaurant LLC Defendants, caused the infringement as a whole to occur.

119.    Carnegie Hospitality and the Individual-Restaurant LLC Defendants own, manage, and/or operate the Carnegie Diners, which employ the Infringing Marks. Carnegie Hospitality and the Individual-Restaurant LLC Defendants, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

120.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

121.    Defendants' use of the Infringing Marks in connection with Carnegie Diner is likely to make consumers mistakenly believe there is a connection, sponsorship, or association between Defendants' Carnegie Diners and Carnegie Hall, and/or that the Carnegie Diners are owned, operated, sponsored or endorsed by, or affiliated with, Carnegie Hall when that is not the case.

122.    Defendants' unauthorized use of the Infringing Marks in connection with the Carnegie Diners is likely to cause confusion or mistake as to the source of Defendants' goods and services, because it falsely suggests that the Carnegie Diners and their goods and services are provided by, connected with, sponsored or endorsed by, affiliated with, or related to, Carnegie Hall.

123.    Defendants had actual and constructive notice of the CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

124.    Defendants knew, or should have known, that their unauthorized use of the Infringing Marks in connection with the Carnegie Diners would cause confusion or mistake as to the source of Defendants' goods and services.

125.    Defendants' unauthorized use of the Infringing Marks was willful.

126.    Consumers have already been led to mistakenly believe there is a connection, sponsorship, endorsement, or association between Defendants' Carnegie Diners and Carnegie Hall, and/or that the Carnegie Diners are owned, operated, sponsored or endorsed by, or affiliated with, Carnegie Hall.

127.    As a result of this confusion, Carnegie Hall has suffered substantial harm and damages, including to the value of its CARNEGIE HALL Marks, its reputation and goodwill, and is likely to suffer additional harm and damages.

128.    Defendants' conduct has substantially harmed and damaged Carnegie Hall and, unless enjoined by the Court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

129.    Defendants' use of the Infringing Marks constitutes false designation of origin in violation of 15 U.S.C. § 1125(a).

130.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief against Defendants, and for all remedies available to it under 15 U.S.C. § 1117, including monetary damages, an accounting and disgorgement of Defendants' profits, Carnegie Hall's reasonable

attorneys' fees and costs, and prejudgment interest, among other remedies as outlined below and any others ordered by the Court.

**THIRD CLAIM FOR RELIEF – AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, CARNEGIE DINER 57, AND CARNEGIE DINER 828**
**UNFAIR COMPETITION UNDER NEW YORK COMMON LAW**

131.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 130 as if fully set forth herein.

132.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 in and to the Registered CARNEGIE HALL Marks in the United States (including New York) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

133.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.   In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

134.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 in and to the CARNEGIE HALL Marks in the state of New York by virtue of the Carnegie Hall Entities' use of the CARNEGIE HALL Marks in the state of New York and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall.

135.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and imagery associated with its performance venue and has developed significant goodwill therein.

136.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization.

137.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 have built their Carnegie Diner business by misappropriating the storied reputation and goodwill built through the Carnegie Hall Entities' skill, expenditures, and labors.

138.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

139.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement and misappropriation to occur.

140.    Defendant Mr. Antonakopoulos, as owner, principal, and operator of Carnegie Hospitality, Carnegie Diner 57, and Carnegie Diner 828, caused the infringement and misappropriation as a whole to occur.

141.    Carnegie Hospitality, Carnegie Diner 57, and Carnegie Diner 828 own, manage, and/or operate the Carnegie Diners located in New York, which employ the Infringing Marks. Carnegie Hospitality, Carnegie Diner 57, and Carnegie Diner 828 therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

142.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

143.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation in

connection with their Carnegie Diners is likely to cause confusion or mistake as to the source of their goods and services, because it falsely suggests that the Carnegie Diners are provided by, connected with, sponsored by, endorsed by, affiliated with, or related to, Carnegie Hall.

144.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 had actual and constructive notice of the CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

145.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 knew, or should have known, that their unauthorized use of the Infringing Marks was likely to cause confusion or mistake as to Carnegie Hall's sponsorship of, association with, or affiliation with Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's Carnegie Diners and related goods and services. Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 knew, or should have known, that their unauthorized use of the Infringing Marks in connection with Carnegie Diners would cause confusion or mistake as to the source of their goods and services.

146.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's unauthorized use of the Infringing Marks was willful.

147.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages, including lost sales and harm to the value of its CARNEGIE HALL Marks, its reputation and goodwill, and Carnegie Hall is likely to suffer additional harm and damages.  This confusion has also caused Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 to profit from their misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

148.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's unauthorized use of the Infringing Marks, unless enjoined by this Court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

149.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's unauthorized use of the Infringing Marks constitutes common law unfair competition under New York law.

150.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief, recovery of any damages proven to have been caused by reason of their aforesaid acts, as well as punitive damages and nominal damages, among other remedies as outlined below and any others ordered by the Court.

### FOURTH CLAIM FOR RELIEF – AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER SECAUCUS
### UNFAIR COMPETITION UNDER NEW JERSEY STATUTE § 56:4-1

151.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 150 as if fully set forth herein.

152.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the United States (including New Jersey) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

153.    The Registered CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

154.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the state of New Jersey by virtue of its use of the CARNEGIE HALL Marks in the state of New Jersey, its use of the CARNEGIE HALL Marks as a name, brand, and trademark and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall.

155.    Carnegie Hall's use of the CARNEGIE HALL Marks in New Jersey includes but is not limited to online ticket sales and online sales of CARNEGIE HALL-branded merchandise to consumers in New Jersey, as well as performances available via video-on-demand, streaming and downloadable podcasts, and streaming educational content available to consumers in New Jersey.  Carnegie Hall also provides restaurant services, food and beverages to New Jersey residents visiting Carnegie Hall's performance venue.

156.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and imagery associated with its performance venue and has developed a strong reputation and significant goodwill therein.

157.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization.

158.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have built their Carnegie Diner business by misappropriating the storied reputation and goodwill built through Carnegie Hall's skill, expenditures, and labors.

159.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

160.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement and misappropriation to occur.

161.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and Carnegie Diner Secaucus, caused the infringement and misappropriation as a whole to occur.

162.    Carnegie Hospitality and Carnegie Diner Secaucus own, manage, and/or operate the Carnegie Diner location in New Jersey, which employs the Infringing Marks.  Carnegie Hospitality and Carnegie Diner Secaucus, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

163.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

164.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized appropriation of the CARNEGIE HALL Marks, including its imagery, brand, trade name, and reputation in connection with Defendants' Carnegie Diners for use in connection with food and beverage services and merchandise, is likely to cause confusion or mistake as to the

source of their goods and services, because it falsely suggests that the Carnegie Diners are provided by, connected with, sponsored by, endorsed by, affiliated with, or related to, Carnegie Hall.

165.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus knew, or should have known, that their unauthorized use of the Infringing Marks was likely to cause confusion or mistake as to Carnegie Hall's sponsorship of, endorsement of, association with, or affiliation with Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's Carnegie Diner and related goods and services.

166.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus had actual and constructive notice of the Registered CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

167.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus knew, or should have known, that their unauthorized use of the Infringing Marks in connection with Carnegie Diner would cause confusion or mistake as to the source of their goods and services.

168.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks was willful.

169.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages, including to the value of its CARNEGIE HALL Marks, its reputation and goodwill, and Carnegie Hall is likely to suffer additional harm and damages.  This confusion has also caused Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus to profit from their misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

170.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks, unless enjoined by this court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

171.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks constitutes unfair competition under New Jersey Stat. § 56:4-1.

172.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief, recovery of any damages proven to have been caused directly or indirectly by reason of their aforesaid acts, trebled in accordance with N.J. Stat. § 56:4-2, among other remedies as outlined below and any others ordered by the Court.

### FIFTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER SECAUCUS
### TRAFFICKING OR ATTEMPTING TO TRAFFIC IN COUNTERFEIT MARKS UNDER NEW JERSEY STATUTE § 56:3-13.16

173.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 172 as if fully set forth herein.

174.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the United States (including New Jersey) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

175.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

176.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the state of New Jersey by virtue of its use of the CARNEGIE HALL Marks in the state of New Jersey, including but not limited to online sale of merchandise to consumers in New Jersey, and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall.  Carnegie Hall also provides restaurant services, food and beverages to New Jersey residents visiting Carnegie Hall's performance venue.

177.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and imagery associated with its performance venue and has developed significant goodwill therein.

178.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization within the state of New Jersey.

179.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's Infringing Marks are a colorable imitation of the CARNEGIE HALL Marks.  Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus use the Infringing Marks in connection with their goods and services in New Jersey, namely the Secaucus, New Jersey, Carnegie Diner location and the sale of infringing merchandise in the state of New Jersey.

180.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have built their Carnegie Diner business through the use of the Infringing Marks.  Carnegie Hospitality,

Mr. Antonakopoulos, and Carnegie Diner Secaucus utilize a CARNEGIE-dominant trade name and applied reproductions, copies, or colorable imitations of Carnegie Hall's building exterior and the interior of its Stern Auditorium / Perelman Stage to the walls of the Carnegie Diner located in the state of New Jersey, among other facts of infringement and unfair competition discussed above.

181.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus use these reproductions, copies, or colorable imitations of images of Carnegie Hall to advertise their goods and services in New Jersey and throughout the United States, including, but not limited to via social media.

182.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

183.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur and reproductions, copies, or colorable imitations to be made and used in connection with the Carnegie Diners.

184.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and Carnegie Diner Secaucus, caused the infringement as a whole to occur and reproductions, copies, or colorable imitations to be made and used in connection with Carnegie Diner.

185.    Carnegie Hospitality and Carnegie Diner Secaucus own, manage, and/or operate the Carnegie Diner in New Jersey, which employs the Infringing Marks.  Carnegie Hospitality and Carnegie Diner Secaucus, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

186.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

187.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks, including reproductions, copies, and colorable imitations of its name and imagery in connection with the Carnegie Diners is likely to cause confusion or mistake as to the source of their goods and services, because it falsely suggests that Carnegie Hall is the source of Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's goods and services.

188.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus had actual and constructive notice of the CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

189.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus knew, or should have known, that their unauthorized use of the Infringing Marks was likely to cause confusion or mistake as to Carnegie Hall's sponsorship of, association with, or affiliation with Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's Carnegie Diners and related goods and services.

190.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's selection and unauthorized use of the Infringing Marks was willful.

191.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages, including to the value of its CARNEGIE HALL Marks, its reputation and goodwill, and Carnegie Hall is likely to suffer additional harm and damages. This confusion has also caused Carnegie

Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus to profit from its misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

192.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks, unless enjoined by this Court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

193.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks constitutes trafficking in counterfeit marks under N.J. Stat. § 56:3-13.16.

194.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief against Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus, and for all remedies available to it under 15 U.S.C. § 1117 as incorporated by reference in N.J. Stat. § 56:3-13.16, including monetary damages, an accounting and disgorgement of Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's profits, destruction of all materials including the Infringing Marks, including but not limited to merchandise, signage, and advertising and marketing materials, Carnegie Hall's reasonable attorneys' fees and costs, and prejudgment interest, among other remedies as outlined below and any others awarded by this Court.

## SIXTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER SECAUCUS
### TRADEMARK INFRINGEMENT UNDER NEW JERSEY COMMON LAW

195.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 194 as if fully set forth herein.

196.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the United States (including New Jersey) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL

Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

197.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

198.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the state of New Jersey by virtue of its use of the CARNEGIE HALL Marks in the state of New Jersey and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall.  Carnegie Hall's use in New Jersey includes but is not limited to online ticket sales and online sales of CARNEGIE HALL-branded merchandise to consumers in New Jersey, as well as performances available via video-on-demand, streaming and downloadable podcasts, and streaming educational content available to consumers in New Jersey.  Carnegie Hall also provides restaurant services, food and beverages to New Jersey residents visiting Carnegie Hall's performance venue.

199.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and has developed significant goodwill therein.

200.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization within the state of New Jersey.

201.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

202.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur.

203.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and Carnegie Diner Secaucus, caused the infringement as a whole to occur.

204.    Carnegie Hospitality and Carnegie Diner Secaucus own, manage, and/or operate the Carnegie Diner in New Jersey, which employs the Infringing Marks.  Carnegie Hospitality and Carnegie Diner Secaucus, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

205.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

206.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's use of the Infringing Marks in connection with the Carnegie Diners suggests that their goods and services, including, but not limited to food and beverage services and the sale of merchandise bearing the Infringing Marks, come from the same source as Carnegie Hall's goods and services, or are otherwise affiliated with, sponsored by, or endorsed by Carnegie Hall.  Such suggestions are false, confusing, and misleading to New Jersey consumers, and material to consumers' purchasing decisions.

207.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks in connection with the Carnegie Diners is likely to cause

confusion or mistake as to the source of their goods and services, because it falsely suggests that the Carnegie Diners and their goods and services are provided by, connected with, sponsored or endorsed by, affiliated with, or related to, Carnegie Hall.  Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus had actual and constructive notice of the CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

208.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus knew, or should have known, that their unauthorized use of the Infringing Marks was likely to cause confusion or mistake as to Carnegie Hall's sponsorship of, association with, or affiliation with Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's Carnegie Diners and related goods and services.

209.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks was willful.

210.    Consumers in the state of New Jersey have already been led to mistakenly believe there is a connection, sponsorship, endorsement, or association between Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's Carnegie Diner and Carnegie Hall, and/or that the Carnegie Diners are owned, operated, sponsored or endorsed by, or affiliated with, Carnegie Hall.

211.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages, including to the value of its CARNEGIE HALL Marks, its reputation and goodwill, and Carnegie Hall is likely to suffer additional harm and damages.  This confusion has also caused Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus to profit from its misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

212.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks, unless enjoined by this Court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

213.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks constitutes common law trademark infringement under New Jersey law.

214.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief, recovery of any damages proven to have been caused by reason of their aforesaid acts, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's profits, as well as to punitive damages and nominal damages, among other remedies as outlined below and any others awarded by this Court.

### SEVENTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER SECAUCUS
### UNFAIR COMPETITION UNDER NEW JERSEY COMMON LAW

215.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 214 as if fully set forth herein.

216.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the United States (including New Jersey) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

217.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, non-functional, inherently distinctive and have acquired distinctiveness.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

218.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the state of New Jersey by virtue of its use of the CARNEGIE HALL Marks in the state of New Jersey, its use of Carnegie Hall as a name, brand, and trademark, and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall.

219.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and imagery associated with its performance venue and develop a strong reputation and significant goodwill therein.

220.    Carnegie Hall provides its services to consumers in New Jersey via online sales and streaming and downloadable audio and video content.  These goods and services include, but are not limited to online ticket sales, online sales of CARNEGIE HALL-branded merchandise, performances available via video-on-demand, streaming and downloadable podcasts, and educational content, all available to consumers in New Jersey.  Carnegie Hall also provides restaurant services, food and beverages to New Jersey residents visiting Carnegie Hall's performance venue.

221.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have promoted, distributed, and used in commerce in New Jersey the Infringing Marks without Carnegie Hall's authorization.

222.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have built their Carnegie Diner business by using the Infringing Marks, which constitute an unprivileged imitation of the CARNEGIE HALL Marks.

223.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

224.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur.

225.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and Carnegie Diner Secaucus, caused the infringement as a whole to occur.

226.    Carnegie Hospitality and Carnegie Diner Secaucus own, manage, and/or operate the Carnegie Diner in New Jersey, which employs the Infringing Marks.  Carnegie Hospitality and Carnegie Diner Secaucus, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

227.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

228.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized appropriation of the CARNEGIE HALL Marks, imagery, brand, trade name, and reputation in connection with the Carnegie Diners for use in connection with their goods and services, is likely to cause confusion or mistake as to the source of Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's goods and services, because it falsely suggests

that their goods and services are provided by, connected with, sponsored by, endorsed by, affiliated with, or related to, Carnegie Hall.

229.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus knew, or should have known, that their unauthorized use of the Infringing Marks was likely to cause confusion or mistake as to Carnegie Hall's sponsorship of, association with, or affiliation with Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's Carnegie Diners and related goods and services.

230.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks was willful.

231.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages, including to the value of its CARNEGIE HALL Marks, its reputation and goodwill, and Carnegie Hall is likely to suffer additional harm and damages.  This confusion has also caused Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus to profit from their misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

232.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks, unless enjoined by this Court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

233.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks constitutes common law unfair competition under New Jersey law.

234.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief and recovery of any damages proven to have been caused directly or indirectly by reason of their aforesaid acts, as well as punitive damages, among other remedies as outlined below and any others ordered by the Court.

**EIGHTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER VIENNA TRADEMARK INFRINGEMENT – VIRGINIA CODE §§ 59.1-92.12, 59.1-92.13**

235.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 234 as if fully set forth herein.

236.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna in and to the CARNEGIE HALL Marks in the United States (including Virginia) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

237.    The Registered CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

238.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna in and to the CARNEGIE HALL Marks in the Commonwealth of Virginia by virtue of its use of the CARNEGIE HALL Marks in the Commonwealth of Virginia, including but not limited to online ticket sales, online sales of CARNEGIE HALL-branded merchandise, performances available via video-on-demand, streaming and downloadable podcasts, and educational content all available to consumers in Virginia, and as evidenced by the numerous

federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall. Carnegie Hall also provides restaurant services, food and beverages to Virginia residents visiting Carnegie Hall's performance venue.

239.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and imagery associated with its goods and services and has developed significant goodwill therein.

240.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization within the Commonwealth of Virginia.

241.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna use a colorable imitation of the CARNEGIE HALL Marks for their Infringing Marks within the Commonwealth of Virginia.

242.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

243.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur.

244.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and Carnegie Diner Vienna, caused the infringement as a whole to occur.

245.    Carnegie Hospitality and Carnegie Diner Vienna own, manage, and/or operate the Vienna, Virginia Carnegie Diner location, which employs the Infringing Marks.   Carnegie

Hospitality and Carnegie Diner Vienna, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

246.   Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

247.   Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks and reproductions, copies, and colorable imitations of the CARNEGIE HALL Marks in connection with their goods and services is likely to cause confusion or mistake as to the source or origin of their goods and services, because it falsely suggests that Carnegie Hall is the source of the Carnegie Diners' goods and services.

248.   Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna had actual and constructive notice of the CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

249.   Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna knew, or should have known, that their unauthorized use of the Infringing Marks in connection with the Carnegie Diners would cause confusion or mistake as to the source of their goods and services.

250.   Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks was willful.

251.   Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages, including to the value of its CARNEGIE HALL Marks, its reputation and goodwill.  Carnegie Hall also is likely to suffer additional harm and damages.  This confusion has also caused Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna to profit from their misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

252.     Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks, unless enjoined by this court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill.  This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

253.     Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks constitutes trademark infringement under Virginia Code § 59.1-92.12.

254.     By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief against Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna, and for all remedies available to it under Virginia Code § 59.1-92.13, including monetary damages, an accounting and disgorgement of Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's profits, destruction of all materials including the Infringing Marks, including but not limited to merchandise, signage, and advertising and marketing materials, and Carnegie Hall's reasonable attorneys' fees, among other remedies as outlined below and any others ordered by the Court.

## NINTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER VIENNA TRADEMARK INFRINGEMENT UNDER VIRGINIA COMMON LAW

255.     Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 254 as if fully set forth herein.

256.     Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna in and to the CARNEGIE HALL Marks in the United States (including Virginia) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered

CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

257.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.   In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

258.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna in and to the CARNEGIE HALL Marks in the Commonwealth of Virginia by virtue of its use of the CARNEGIE HALL Marks in the Commonwealth of Virginia, and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall.  Carnegie Hall's use in Virginia includes but is not limited to online ticket sales and online sales of CARNEGIE HALL-branded merchandise to consumers in Virginia, as well as performances available via video-on-demand, streaming and downloadable podcasts, and streaming educational content available to consumers in Virginia. Carnegie Hall also provides restaurant services, food and beverages to Virginia residents visiting Carnegie Hall's performance venue.

259.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and imagery associated with its goods and services and has developed significant goodwill therein.

260.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization within the Commonwealth of Virginia.

261.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior

and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners, and caused the reproductions, copies, or colorable imitations of them to be used in connection with the Carnegie Diners.

262.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur and reproductions, copies, or colorable imitations to be made and used.

263.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and Carnegie Diner Vienna, caused the infringement as a whole to occur.

264.    Carnegie Hospitality and Carnegie Diner Vienna own, manage, and/or operate the Vienna, Virginia Carnegie Diner, which employs the Infringing Marks. Carnegie Hospitality and Carnegie Diner Vienna, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

265.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

266.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's use of the Infringing Marks in connection with the Carnegie Diners is likely to make consumers mistakenly believe there is a connection, sponsorship, or association between their Carnegie Diners and Carnegie Hall, and/or that the Carnegie Diners are owned, operated, sponsored or endorsed by, or affiliated with, Carnegie Hall when that is not the case.

267.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks in connection with the Carnegie Diners is likely to cause confusion or mistake as to the source of their goods and services, because it falsely suggests that

the Carnegie Diners and their goods and services are provided by, connected with, sponsored or endorsed by, affiliated with, or related to, Carnegie Hall.

268.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna had actual and constructive notice of the CARNEGIE HALL Marks before they selected, adopted, and used the Infringing Marks.

269.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna knew, or should have known, that their unauthorized use of the Infringing Marks in connection with Carnegie Diners would cause confusion or mistake as to the source of Defendants' goods and services.

270.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks was willful.

271.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages, including to the value of its CARNEGIE HALL Marks, its reputation and goodwill. Carnegie Hall also is likely to suffer additional harm and damages. This confusion has also caused Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna to profit from their misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

272.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks, unless enjoined by this court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill. This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

273.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks constitutes common law trademark infringement under Virginia law.

274.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief, recovery of any damages proven to have been caused by reason of their aforesaid acts, and Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's profits, among other remedies as outlined below and any others ordered by the Court.

**TENTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER VIENNA**
**UNFAIR COMPETITION UNDER VIRGINIA COMMON LAW**

275.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 274 as if fully set forth herein.

276.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna in and to the CARNEGIE HALL Marks in the United States (including Virginia) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

277.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

278.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna in and to the CARNEGIE HALL Marks in the Commonwealth of Virginia by virtue of its use of the CARNEGIE HALL Marks in the Commonwealth of Virginia, its use of

Carnegie Hall as a name, brand, and trademark and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall.

279.    Carnegie Hall has made significant expenditures, both financial and through the skill and labor of its employees, to promote its brand as embodied in the CARNEGIE HALL Marks and imagery associated with its performance venue and to develop a strong reputation and significant goodwill therein.

280.    Carnegie Hall provides its goods and services to consumers in Virginia via online sales and streaming and downloadable audio and video content.  These goods and services include, but are not limited to online ticket sales, online sales of CARNEGIE HALL-branded merchandise, performances available via video-on-demand, streaming and downloadable podcasts, and educational content, all available to consumers in Virginia. Carnegie Hall also provides restaurant services, food and beverages to Virginia residents visiting Carnegie Hall's performance venue.

281.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna have promoted, distributed, and used in commerce the Infringing Marks without Carnegie Hall's authorization.

282.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

283.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the infringement to occur.

284.    Defendant Mr. Antonakopoulos, as owner and operator of Carnegie Hospitality and Carnegie Diner Vienna, caused the infringement as a whole to occur.

285.    Carnegie Hospitality and Carnegie Diner Vienna own, manage, and/or operate the Vienna, Virginia Carnegie Diner location, which employs the Infringing Marks.    Carnegie Hospitality and Carnegie Diner Vienna, therefore, including by and through Mr. Antonakopoulos, caused the infringement to occur.

286.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

287.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna have built their Carnegie Diner business by making unauthorized use of the Infringing Marks.

288.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized appropriation of the CARNEGIE HALL Marks, imagery, brand, trade name, and reputation in connection with the Carnegie Diners for use in connection with their goods and services, is likely to cause confusion or mistake as to the source of Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's goods and services, because it falsely suggests that the Carnegie Diners are provided by, connected with, sponsored by, affiliated with, or related to, Carnegie Hall.

289.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna knew, or should have known, that their unauthorized use of the Infringing Marks was likely to cause confusion or mistake as to Carnegie Hall's sponsorship or endorsement of, association with, or affiliation with their Carnegie Diners and related goods and services.

290.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks was willful.

291.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks has caused Carnegie Hall substantial harm and damages,

including to the value of its CARNEGIE HALL Marks, its reputation and goodwill, and Carnegie Hall is likely to suffer additional harm and damages. This confusion has also caused Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna to profit from their misappropriation and unauthorized use of the CARNEGIE HALL Marks, imagery, brand, and reputation.

292. Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks, unless enjoined by this court, will further impair the value of Carnegie Hall's CARNEGIE HALL Marks, reputation, and goodwill. This harm constitutes an injury for which Carnegie Hall has no adequate remedy at law.

293. Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's unauthorized use of the Infringing Marks constitutes common law unfair competition under Virginia law.

294. By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief, recovery of any damages proven to have been caused by reason of their aforesaid acts, and Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Vienna's profits, among other remedies as outlined below and any others ordered by the Court.

## ELEVENTH CLAIM FOR RELIEF – AGAINST ALL DEFENDANTS
## FEDERAL DILUTION OF THE CARNEGIE HALL MARKS – 15 U.S.C. § 1125(c)

295. Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 294 as if fully set forth herein.

296. Carnegie Hall has prior rights over Defendants in and to the CARNEGIE HALL Marks in the United States by virtue of the Carnegie Hall Entities' longtime, continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but

not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

297. The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive, have acquired distinctiveness, and are famous. In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

298. The CARNEGIE HALL Marks have been in extensive, continuous, and exclusive use in connection with the Carnegie Hall Entities' goods and services for as long as 130 years.

299. The CARNEGIE HALL Marks are widely recognized by the general consuming public across the United States because Carnegie Hall's goods and services are marketed nationwide, including but not limited to Carnegie Hall's video-on-demand, radio and podcast services, merchandise, restaurant services, and educational services that are marketed to local orchestras and schools.

300. The CARNEGIE HALL Marks frequently appear in a wide array of channels of trade, including but not limited to national magazines and newspapers, both solicited and unsolicited.

301. Carnegie Hall enjoys a high volume of sales of goods and services under the CARNEGIE HALL Marks.

302. The CARNEGIE HALL Marks are widely recognized nationwide and have been famous since before Defendants began using the Infringing Marks.

303. Carnegie Hall enjoys substantially exclusive use of the CARNEGIE HALL Marks.

304. As discussed above, Defendants have promoted, distributed, and used in interstate commerce the Infringing Marks without Carnegie Hall's authorization.

305. Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

306. Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the dilution to occur.

307. Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and the Individual-Restaurant LLC Defendants, caused the dilution as a whole to occur.

308. Carnegie Hospitality and the Individual-Restaurant LLC Defendants own, manage, and/or operate the Carnegie Diners, which employ the Infringing Marks. Carnegie Hospitality and the Individual-Restaurant LLC Defendants, therefore, including by and through Mr. Antonakopoulos, caused the dilution to occur.

309. Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

310. The Infringing Marks are nearly—and in relevant parts, fully—identical to the CARNEGIE HALL Marks.

311. Defendants intended to create an association with the CARNEGIE HALL Marks, and as a result, consumers associate Defendants' Carnegie Diner goods and services with Carnegie Hall and the CARNEGIE HALL Marks.

312. Defendants' dilution of the CARNEGIE HALL Marks was willful.

313. Due to their near-identical similarity, Defendants' Infringing Marks are likely to create an association with the CARNEGIE HALL Marks.

314.    As a result of Defendants' actions, consumers do, in fact, associate the Infringing Marks with the CARNEGIE HALL Marks.

315.    Defendants' actions are likely to reduce the ability of the CARNEGIE HALL Marks to identify Carnegie Hall's goods and services.

316.    Defendants' actions are likely to cause consumers to mistakenly associate negative experiences regarding or perceptions of Defendants' Carnegie Diners and their goods and services to Carnegie Hall, thereby harming the reputation of Carnegie Hall and the famous CARNEGIE HALL Marks.

317.    Defendants' actions described above, all occurring after the CARNEGIE HALL Marks became famous, are likely to cause dilution of the famous CARNEGIE HALL Marks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

318.    As a direct and proximate result of Defendants' actions alleged above, Carnegie Hall has been damaged and will continue to be damaged.

319.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief against Defendants, and for all remedies available to it under 15 U.S.C. §§ 1117(a) and 1118, including monetary damages, an accounting and disgorgement of Defendants' profits, Carnegie Hall's reasonable attorneys' fees and costs, prejudgment interest, and destruction of the diluting merchandise, imagery, and other items, among other remedies as outlined below and any others ordered by the Court.

### TWELFTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, CARNEGIE DINER 57, AND CARNEGIE DINER 828
### NEW YORK STATE DILUTION OF THE CARNEGIE HALL MARKS – N.Y. Gen. Bus. L. § 360(l)

320.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 319 as if fully set forth herein.

321.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 in and to the CARNEGIE HALL Marks in the United States (including New York) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

322.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive, have acquired distinctiveness, and are famous.  In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

323.    The CARNEGIE HALL Marks have been in extensive, continuous use in connection with the Carnegie Hall Entities' goods and services in New York for as long as 130 years.

324.    The CARNEGIE HALL Marks are widely recognized by the general consuming public in New York, because of Carnegie Hall's landmark status, frequent press coverage, and because of the Carnegie Hall Entities' use in commerce in New York for 130 years, among other reasons.

325.    The CARNEGIE HALL Marks frequently appear in a wide array of channels of trade, including but not limited to national magazines and newspapers, both solicited and unsolicited, as well as popular television programs and films.

326.    Carnegie Hall enjoys a high volume of sales of goods and services under the CARNEGIE HALL Marks.

327. The CARNEGIE HALL Marks are widely recognized, well known, distinctive, and famous in New York and nationwide.

328. Carnegie Hall enjoys substantially exclusive use of the CARNEGIE HALL Marks.

329. As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 have promoted, distributed, and used in commerce in the state of New York, the Infringing Marks without Carnegie Hall's authorization.

330. Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

331. Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the dilution to occur.

332. Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality, Carnegie Diner 57, and Carnegie Diner 828, caused the dilution as a whole to occur.

333. Carnegie Hospitality, Carnegie Diner 57, and Carnegie Diner 828 own, manage, and/or operate the Carnegie Diners in New York, which employ the Infringing Marks. Carnegie Hospitality, Carnegie Diner 57, and Carnegie Diner 828, therefore, including by and through Mr. Antonakopoulos, caused the dilution to occur.

334. Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

335. Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's unauthorized use of the Infringing Marks is substantially similar, if not identical to, the CARNEGIE HALL Marks.

336.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828 intended to create an association with the CARNEGIE HALL Marks, and as a result, consumers associate their Carnegie Diners with the CARNEGIE HALL Marks.

337.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's dilution of the CARNEGIE HALL Marks was willful.

338.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's actions are likely to reduce the ability of the CARNEGIE HALL Marks to identify Carnegie Hall's goods and services.

339.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's actions are likely to cause consumers to mistakenly associate negative experiences regarding or perceptions of Defendants' Carnegie Diners with Carnegie Hall, thereby harming the reputation of the famous CARNEGIE HALL Marks.

340.    Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's actions described above, all occurring after the CARNEGIE HALL Marks became distinctive and famous, are likely to cause dilution of the distinctive and famous CARNEGIE HALL Marks in violation of New York General Business Law § 360(l).

341.    As a direct and proximate result of Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828's actions alleged above, Carnegie Hall has been damaged and will continue to be damaged.

342.    By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief against Carnegie Hospitality, Mr. Antonakopoulos, Carnegie Diner 57, and Carnegie Diner 828, restraining them and all those in active concert and participation with them from any further acts

of dilution, and attorneys' fees, among other remedies as outlined below and any others ordered by the Court.

**THIRTEENTH CLAIM FOR RELIEF - AGAINST CARNEGIE HOSPITALITY, EFSTATHIOS ANTONAKOPOULOS, AND CARNEGIE DINER SECAUCUS NEW JERSEY STATE DILUTION OF THE CARNEGIE HALL MARKS – N.J. Stat. § 56:3-13.20**

343.    Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 342 as if fully set forth herein.

344.    Carnegie Hall has prior rights over Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus in and to the CARNEGIE HALL Marks in the United States (including New Jersey) by virtue of the Carnegie Hall Entities' continuous use of the CARNEGIE HALL Marks in interstate commerce and as evidenced by the numerous federal registrations for the Registered CARNEGIE HALL Marks owned by Carnegie Hall, including, but not limited to U.S. Reg. Nos. 1,599,952; 1,818,456; 2,358,244; 6,046,767; 7,263,101; 6,804,867; 3,753,335; and 2,707,933.

345.    The CARNEGIE HALL Marks are valid, subsisting, used in commerce, inherently distinctive and have acquired distinctiveness.   In addition, U.S. Reg. Nos. 1,599,952 and 2,358,244, *inter alia*, have achieved incontestability.

346.    The CARNEGIE HALL Marks have been in extensive, continuous use in connection with the Carnegie Hall Entities' goods and services for as long as 130 years.

347.    The CARNEGIE HALL Marks frequently appear in a wide array of channels of trade, including but not limited to national magazines and newspapers, both solicited and unsolicited, as well as popular television programs and films.

348.    Carnegie Hall enjoys a high volume of sale of goods and services under the CARNEGIE HALL Marks.

349.    The CARNEGIE HALL Marks are widely recognized by the general consuming public in New Jersey and across the United States because Carnegie Hall's goods and services are marketed nationwide, including but not limited to Carnegie Hall's online ticket sales, video-on-demand, radio and podcast services, online merchandise, restaurant services, and educational services that are marketed to local orchestras and schools.

350.    Carnegie Hall enjoys substantially exclusive use of the CARNEGIE HALL Marks.

351.    As discussed above, Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus have promoted, distributed, and used in commerce in the state of New Jersey (and elsewhere), the Infringing Marks without Carnegie Hall's authorization.

352.    Defendant Mr. Antonakopoulos actively and knowingly selected the Infringing Marks, including the infringing merchandise, décor consisting of full-wall murals of the interior and exterior of Carnegie Hall's building and other visual indicia associated with Carnegie Hall for the Carnegie Diners.

353.    Defendant Mr. Antonakopoulos was, therefore, a moving, conscious force that caused the dilution to occur.

354.    Defendant Mr. Antonakopoulos, as owner, principal and/or operator of Carnegie Hospitality and Carnegie Diner Secaucus, caused the dilution as a whole to occur.

355.    Carnegie Hospitality and Carnegie Diner Secaucus own, manage, and/or operate the Secaucus, New Jersey Carnegie Diner, which employs the Infringing Marks.  Carnegie Hospitality and Carnegie Diner Secaucus, therefore, including by and through Mr. Antonakopoulos, caused the dilution to occur.

356.    Carnegie Hospitality purports to own the Infringing Marks, including U.S. Registration No. 6,632,349 and U.S. Serial No. 99/040389.

357.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's unauthorized use of the Infringing Marks is substantially similar, if not identical to, the CARNEGIE HALL Marks.

358.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus intended to create an association with the CARNEGIE HALL Marks, and as a result, consumers associate their Carnegie Diners with the CARNEGIE HALL Marks.

359.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's dilution of the CARNEGIE HALL Marks was willful.

360.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's actions are likely to reduce the ability of the CARNEGIE HALL Marks to identify Carnegie Hall's goods and services.

361.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's actions are likely to cause consumers to mistakenly associate negative experiences regarding or perceptions of Defendants' Carnegie Diners with Carnegie Hall, thereby harming the reputation of the famous CARNEGIE HALL Marks.

362.    Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's actions described above, all occurring after the CARNEGIE HALL Marks became distinctive and famous, are likely to cause dilution of the distinctive and famous CARNEGIE HALL Marks in violation of New Jersey Statute § 56:3-13.20.

363.    As a direct and proximate result of Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's actions alleged above, Carnegie Hall has been damaged and will continue to be damaged.

364. By reason of the foregoing, Carnegie Hall is entitled to permanent injunctive relief against Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus, restraining them and all those in active concert and participation with them from any further acts of dilution, as well as monetary damages, an accounting and disgorgement of Carnegie Hospitality, Mr. Antonakopoulos, and Carnegie Diner Secaucus's profits, destruction of all materials including the Infringing Marks, including but not limited to merchandise, signage, and advertising and marketing materials, Carnegie Hall's reasonable attorneys' fees and costs, and prejudgment interest, as authorized by N.J. Stat. §§ 56:3-13.16(f) and 56:3-13.20, among other remedies as outlined below and any others ordered by the Court.

### FOURTEENTH CLAIM FOR RELIEF – AGAINST CARNEGIE HOSPITALITY
### CANCELLATION OF FEDERAL TRADEMARK REGISTRATION (15 U.S.C. § 1119)

365. Carnegie Hall repeats and re-alleges each and every allegation set forth in paragraphs 1 through 364 as if fully set forth herein.

366. Carnegie Hospitality is the owner of U.S. Registration No. 6,632,349 for CARNEGIE DINER & CAFÉ in Class 43 for "Restaurant and café services; Restaurant services; Restaurant services, including sit-down service of food and take-out restaurant services; Restaurant services, namely, providing of food and beverages for consumption on and off the premises."

367. As discussed above, the Infringing Marks, which include Registration No. 6,632,349, are confusingly similar to the CARNEGIE HALL Marks, and are likely to cause consumer confusion.

368. Carnegie Hall and its CARNEGIE HALL Marks have priority over Carnegie Hospitality, including based on the Carnegie Hall Entities' decades of offering food and beverage services in connection with the CARNEGIE HALL Marks.

369.    Accordingly, pursuant to 15 U.S.C. § 1119, this Court should order that U.S. Registration No. 6,632,349 be cancelled.

## PRAYER FOR RELIEF

WHEREFORE, Carnegie Hall demands a trial by jury, and respectfully prays that the Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

1.    An Order declaring that Defendants' use of the Infringing Marks is infringing, is likely to dilute the CARNEGIE HALL Marks, and constitutes unfair competition under federal and/or state law, as detailed above;

2.    An injunction permanently enjoining Defendants and all those in active concert or participation with them (including, but not limited to their franchisees and licensees, and all of their respective officers, directors, agents, principals, servants, wholesalers, distributors, retailers, employees, representatives, attorneys, subsidiaries, parents, related companies, affiliates, successors, assigns, and contracting parties) from:

    (i)    using anywhere in the United States, applying to register in the United States, or maintaining a registration in the United States for the Infringing Marks, or any other trademark or trade dress that is confusingly similar to the CARNEGIE HALL Marks, including, but not limited to, on its restaurants, marketing materials, websites, and/or social media platforms; and

    (ii)    representing, by any means whatsoever, that any products or services manufactured, distributed, advertised, offered, or sold by Defendants are Carnegie Hall's products or services or vice versa, and from otherwise

acting in a way likely to cause confusion, mistake, or deception on the part of purchasers or consumers as to the origin, sponsorship, affiliation, or association of such goods or services.

3.      An Order Directing that Defendants and all those in active concert or participation with it (including but not limited to, their respective officers, directors, agents, principals, servants, wholesalers, distributors, retailers, their franchisees and licensees, and all of their employees, representatives, attorneys, subsidiaries, parents, related companies, affiliates, successors, assigns, and contracting parties) take affirmative steps in the United States to dispel such false impression that heretofore has been created by their use of the Infringing Marks, including but not limited to, recalling from any and all channels of trade any and all materials promoting or advertising the infringing goods and services, and undertaking corrective advertising.

4.      An Order directing that Defendants account to Carnegie Hall for their profits and any damages sustained by Carnegie Hall, to the extent calculable, arising from the foregoing acts of trademark infringement, false designation of origin, dilution, and unfair competition in the United States.

5.      An Order requiring that, in accordance with such accounting, Defendants pay to Carnegie Hall any such profits and damages, to the extent they are nonduplicative, and a trebling of such award, pursuant to 15 U.S.C. § 1117; N.J. Stat. §§ 56:3-13.16(f), 56:3-13.20; Virginia Code §§ 59.1-92.13, 59.1-204; and any other applicable laws.

6.      An Order requiring that Defendants pay Carnegie Hall punitive damages pursuant to New York unfair competition law, New Jersey trademark law, and New Jersey unfair competition law, in view of Defendants' intentional and willful trademark infringement and other conduct, in an amount to be determined at trial.

7.      An Order requiring that Defendants compensate Carnegie Hall for Carnegie Hall's costs, including its reasonable attorneys' fees and disbursements in this action, pursuant to 15 U.S.C. § 1117, New York unfair competition law, and N.J. Stat. §§ 56:3-13.16(f), 56:3-13.20, Virginia Code §§ 59.1-92-13, 51.1-204, and any other applicable laws.

8.      An Order requiring that Defendants file with the Court and serve on counsel for Carnegie Hall within thirty (30) days after entry of any injunction issued by the Court in this action, a sworn written statement pursuant to 15 U.S.C. § 1116(a) and N.J. Stat. §§ 56:3-13.16(f), 56:3-13.20, Virginia Code §§ 59.1-92-13 and 51.1-204 setting forth in detail the manner and form in which Defendants have complied with any injunction which the Court may enter in this action.

9.      An Order for the destruction of all materials including the Infringing Marks, including but not limited to merchandise, signage, and advertising and marketing materials.

10.     An Order directing the USPTO to cancel U.S. Registration No. 6,632,349.

11.     Other relief as the Court may deem just and proper.


Dated:  May 20, 2025                      */s/ Shanti Sadtler Conway*

Dale M. Cendali
Shanti Sadtler Conway
Jeremy C. King
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-6460
dale.cendali@kirkland.com
shanti.conway@kirkland.com
jeremy.king@kirkland.com

*Attorneys for Plaintiff The Carnegie Hall Corporation*